SEND

FILED
CLERK, U.S. DISTRICT COURT

DEC - 6 2004

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ULTIMAX CEMENT MANUFACTURING, et al., | SA CV 02-578 AHS (ANx) |
| Plaintiffs, | **ORDER** (1) GRANTING DEFENDANTS AND COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGMENT FOR INVALIDITY; (2) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT '556; (3) GRANTING IN PART AND DENYING IN PART, DEFENDANT CTS'S MOTION FOR SUMMARY JUDGMENT ON NON-TECHNICAL GROUNDS RE: U.S. PATENT '556; (4) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PATENT VALIDITY AND ENFORCEABILITY; (5) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DEFENSES OF ALLEGED AGREEMENT TO INVENT, SHOP RIGHTS, AND LACHES |
| v. | |
| CTS CEMENT MANUFACTURING CORPORATION, et al., | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | **ORDER** SETTING JURY TRIAL MARCH 1, 2005, AT 9:00 A.M.; PRETRIAL CONFERENCE FEBRUARY 7, 2005, AT 2:00 P.M.; MOTIONS IN LIMINE FEBRUARY 18, 2005, AT 1:30 P.M. |



DOCKETED ON CM

DEC - 8 2004

BY _____ 039

I.

**PROCEDURAL HISTORY**

On March 1, 2004, defendant and counterclaimant CTS

Manufacturing Corp. filed a Motion for Summary Judgment on Non-Technical Grounds Re: U.S. Patent `556. Plaintiffs Ultimax Cement Manufacturing Corp. (hereafter "Ultimax"), Hassan Kunbargi and Heartland Cement Sales Co. filed opposition thereto on March 23, 2004. Defendants filed a reply on March 29, 2004, and a supplemental brief on April 30, 2004, occasioned by issuance of the preliminary report by the Court-appointed expert, Dr. Frieder Seible. Plaintiffs filed a response to the supplemental brief on May 6, 2004.

On June 2, 2004, defendants and counterclaimants Eric Bescher, CTS, CTS Bulk Terminals Co., CTS, Chem-Corp Systems Inc., Rapid-Set Products and Edward K. Rice filed a Motion for Summary Judgment of Invalidity for Indefiniteness and Partial Summary Judgment of Non-Infringement Re: U.S. Patent `556. Ultimax filed opposition on June 14, 2004, and on July 26, 2004, the moving parties filed their reply brief. On July 28, 2004, plaintiffs filed a supplemental memorandum incorporating the deposition of Dr. Seible. Defendants and counterclaimants filed their response to plaintiffs' memorandum on August 2, 2004.

On July 9, 2004, plaintiffs filed a Motion for Partial Summary Judgment on Patent Validity and Enforceability. Defendants, joined by A&A Ready, Blue Daisy, Jack V. Goodman, Short Load Concrete, Ryan Vanderhook Sr., and White Cap Industries, filed opposition on July 26, 2004. Plaintiffs filed their reply on August 2, 2004.

Plaintiffs also filed a Motion for Partial Summary Judgment on Defendants' Defenses of Alleged Agreement to Invent, Shop Rights and Laches on July 9, 2004. Defendants opposed the

motion on July 26, 2004, and plaintiffs filed their reply on August 2, 2004.

The Court heard oral arguments on these and other motions on September 13 and September 27, 2004.

The Court, having considered the parties' arguments, both oral and written, and the authorities raised in the parties' papers, issues its rulings as hereinafter set forth.

## II.

### FACTUAL BACKGROUND

Plaintiffs Ultimax, Hassan Kunbargi, Heartland Cement Sales Co., and KA Group are the patent holder and licensees of U.S. Patent Nos. 6,113,684 ('684), 6,406,534 ('534), and 4,957,556 ('556).[1] All patents are for a pre-cursor compound to cement known as "clinker"[2] and the resulting cement that rapidly hardens into early, high-strength concrete. Clinker is mixed with hydraulic[3] or portland-type cement and water to form concrete. '684 5:33; '556 1:17-20. The resulting concrete becomes very strong exceptionally quickly; however, it also dries

---

[1]   A claim of infringement of the '556, the earliest of the three patents, was added in the First Amended Complaint, filed March 12, 2003.

[2]   "Clinker" is one of the main building blocks of the cement taught in the patents. Its production is the first stage of the cement manufacturing process. '684 5:26-35. Clinker, when formed, is a grayish granular substance made up of various raw materials or compounds that come from limestone, bauxite, and gypsum. Limestone, bauxite and gypsum are themselves made up of compounds, the composition of which can be determined by one skilled in the art. '684 13:4-12. These "raw materials" are heated in a kiln to create clinker. '556 3:27-35.

[3]   "Hydraulic" simply means that the substance is "effected by water." Portland cement is hydraulic. McGraw-Hill Dictionary of Scientific and Technical Terms at 1643 (hereinafter McGraw-Hill).

very fast.  At times certain retarding agents must be added to the cement mix to prevent rapid hardening and to increase workable time.  The number of hours the cement takes to harden, and to what strength, varies according to each patent.  For example, the resulting cement taught by the '556 patent hardens to 3000 pounds per square inch ("psi") in one hour, while the cement taught by the '684 patent reaches 5,000 psi in one hour.  The greater the psi, the stronger the cement.  Rapid hardening and early high strength cement is particularly useful for certain projects, such as roads and bridges, where it is advantageous to expedite the construction process.

Hassan Kunbargi and Ed Rice, two central figures in this case, have a long history together.  Defendant Rice first met Kunbargi when Kunbargi was a graduate student in the 1980's at the University of California at Los Angeles ("UCLA").  In 1984, as Kunbargi began experimenting with cement chemistry, Rice became Kunbargi's mentor and sought an adjunct faculty position at UCLA so that he could serve as Kunbargi's advisor.  According to plaintiffs, Kunbargi conceived the clinker/cement embodied in the '556 patent at this time.  In late 1985, Kunbargi began to work for Rice's company.  Plaintiffs assert that this employment was merely on a contract basis.  During such employment, according to defendants, Kunbargi "reduced to practice" the cement taught by the '556 patent during a testing procedure known as "Burn One" that took place at a Heartland Cement Co. (hereafter "HCC") facility in Kansas.  The cement produced at Burn One may have included certain raw materials, such $CaSO_4$ anhydride/anhydrite, and $C_4A_3Sbar$.  Plaintiffs, for their part,

4

argue that Kunbargi conceived of these formulae in his UCLA lab in 1984.

After Burn One, and in response to a letter from Rice, Kunbargi stated that the "new cement" was patentable and requested additional compensation. (Kashani decl. Ex. M at 4). Rice denied this request. Later in April of 1990, Rice and Kunbargi exchanged letters regarding the "ownership of technology." The parties did not reach any agreement and, in September 1990, after Kunbargi and Rice had terminated their relationship, Kunbargi received the '556 patent.

**III.**

**SUMMARY OF PARTIES' CONTENTIONS**

**A.**      **The Parties' Motions Re:  Patent Invalidity**

CTS contends that both the '556 and '684 patents are indefinite and thus invalid.  The patents teach that after heating, the clinker will have high concentrations of three special types of crystals, described in the patents as Crystal X, Crystal Y, and Crystal Z.  '684 5:30-35.  The '684 patent states that Crystal Y and Crystal Z are "new and unexpected crystals" that "have never been formed in a cement kiln."  '684 5:63-65.

Defendants contend that, because the chemical formulae for Crystal X[4] and Crystal Y[5] are indefinite, they cannot form the basis of a valid patent.  In particular, defendants point out that the chemical notation for Crystal X does not correspond to any recognized chemical compound and, rather, the formula for

---

[4]     The formula for Crystal X is:
$\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,S \text{ bar})\}$

[5]     The formula for Crystal Y is: $C_9Ss(\text{bar})_3Ca(f \ cl)_2$.

5

Crystal X could potentially include over 5,500 chemical compounds. As such, defendants charge that one skilled in the art would find the formula ambiguous and indefinite. According to defendants, the formula for Crystal Y is similarly indefinite because it is riddled with errors that make it ambiguous and that any attempts to "clarify" are in fact attempts to rewrite the formula post-litigation which is impermissible.

In plaintiffs' opposition and in their own motion for a declaration of validity, plaintiffs contend that defendants are precluded from asserting invalidity as to the '556 patent because they have not claimed invalidity, but instead asserted equitable rights in the inventions. Plaintiffs further allege that the patent is valid and definite because certain CTS employees, namely, Dr. Eric Bescher, implemented a testing protocol to analyze Crystal X. Additionally, plaintiffs contend that others in the industry are aware of its composition. According to plaintiffs, these facts demonstrate that one skilled in the art could easily understand the chemistry taught by the patents for Crystal X and Crystal Y, and, thus, the patents are definite.

The next indefiniteness issue concerns compression strength and testing methods. Defendants allege that Claim 17 of the '684 patent, claims 9-11 of the '556 patent and claims 10-11 of the '534 patent are indefinite because the psi of cement varies depending on the test employed. Neither the '534 patent nor the '684 patent refer to a testing protocol. While the '556 refers to a "standard ASTM procedure 109" for testing, defendants contend this is a series of tests which can be altered in numerous ways that in turn can alter the compression strength

measurements.[6] Defendants allege that the lack of specific instruction as to how to test the cement renders all three patents invalid for indefiniteness. In response, plaintiffs reiterate their contention above that defendants' ability to analyze and compare the cement, and specifically the compression strength, demonstrates the definiteness and clarity of the teachings in the patent.

**B.        Motion for Non-Infringement**

The parties divide sharply over whether claims 9-11 of the '556 patent should read "anhydrite" rather than "anhydride," which is how it is stated in the patent. CTS's accused cement does not contain the latter compound; therefore, if the patent does not cover anhydride, CTS's cement cannot infringe the '556 patent. Plaintiffs respond that anhydyride and anhydrite are synonymous in the context in claims 9-11 of the '556 patent.

**C.        Motions Re:  Estoppel, Laches and Shop Rights**

Plaintiffs seek partial summary judgment on defendants' defenses of alleged agreement to invent, shop rights, and laches/equitable estoppel. The defenses of the agreement to invent and shop rights are based on Kunbargi's employment with CTS and Ed Rice. The parties dispute both the nature of the employment and the scope of the employment relationship vis-a-vis ownership of inventions. Plaintiffs further contend that even if the employment relationship involved an agreement covering

---

[6]    Cement is measured in terms of "compression strength" which refers to the cement's ability to withstand certain pressures. '684 5:50-56; Seible at 5. In the patents, compression strength is measured in pounds per square inch. The higher the psi, the stronger the cement.

certain inventions, both the statute of limitations and the statute of frauds render this agreement unenforceable.

As to the defenses of laches and equitable estoppel, plaintiffs argue that the burden is on the defendants to show that Kunbargi was able to determine the infringement at an earlier date and file suit. Plaintiffs also allege that even if Kunbargi could have filed suit sooner, CTS's alleged assurances of non-infringement negate any inference of unreasonable delay. Moreover, according to plaintiffs, defendants have not shown any prejudice, and, even if the elements of unreasonable delay and prejudice are shown, the egregious conduct of defendants defeats the equitable defense of laches.

For their part, defendants respond that Kunbargi had knowledge of the potential legal entanglements over the ownership of technology for over twelve years, yet at no time did he make efforts to investigate any infringements or otherwise enforce his rights. According to CTS, this delay is not only unreasonable, it has also caused CTS prejudice because a number of key players involved in the relevant events have either passed away or are no longer available.

## IV.

## DISCUSSION

**A.      Plaintiff's Motion for a Declaration of Validity**

As a preliminary matter, plaintiffs' motion for "Partial Summary Judgment on Patent Validity and Enforceability" appears procedurally improper. Plaintiffs cite no Federal Circuit authority which holds that a patentee may affirmatively move for a judgment of validity. A patent enjoys a presumption

of validity. 35 U.S.C. § 282. Fed. R. Civ. P. 56(a) states that a "party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment" may move for summary judgment. "Validity" is not a claim or defense in this action. The cited case law permits "a moving party seeking to have a patent held not invalid" to move for summary judgment where the opposing party has asserted a declaratory relief claim of invalidity. Eli Lilly & Co. v. Barr Labs., 251 F.3d 955, 962 (Fed. Cir. 2001) (emphasis added). Although the court in L.A. Gear v. E.S. Originals permitted a motion for summary judgment for enforceability even though this issue was not raised as a claim or defense, that court cited no authority in support of ruling on enforceability where it was not pleaded as a claim or defense. 35 U.S.P.Q. 1497, 1500 (C.D. Cal. 1995).

A declaration of "validity" has potentially far-reaching implications, and the Court declines to enter unnecessarily into vague and vast territories of uncertainty. For instance, it is unclear whether a judgment of validity could be used for the purposes of collateral estoppel against other accused infringers. Perhaps third-parties, not present in this action, might discover invalidating prior art or prosecution fraud which has not been raised in this case. Clear guidance by a higher court would be required before this Court would contemplate such a broad decree. The Court thus elects to treat plaintiffs' motion as one that seeks to have the patents found "not invalid" on the grounds raised by defendants. In the context of these motions, plaintiffs' motion serves as a cross-motion that the patent is not invalid for indefiniteness.

**B.**   **Defendants' Motion for Summary Judgment of Patent Invalidity for Indefiniteness**

"Section 112 paragraph 2 of the Patent Act requires that a patent specification conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Exxon Research & Eng'g v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001); 35 U.S.C. § 112, ¶ 2. Whether a claim is invalid under § 112, ¶ 2 is a question of law "arising out of the court's performance of its duty construing the claims." BJ Serv. v. Halliburton Energy Serv., 338 F.3d 1368, 1372 (Fed. Cir. 2003); Union Pac. Resources Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692 (Fed. Cir. 2001). A claim satisfies § 112 "if one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon Research, 265 F.3d at 1376. Thus, the issue of definiteness is nearly always resolvable at summary judgment because a claim term is either clearly defined or it is not, and underlying factual disputes do not generally prevent summary judgment on the issue. Id.; cf. BJ Serv.; 338 F.3d at 1372-73 (finding a genuine issue of material fact where there was evidence that appellant's expert had fabricated test results).

"In determining whether that standard is met, i.e., whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing" a claim is not indefinite merely because it is difficult to understand. Morton Int'l v. Cardinal Chem. Co., 5 F.3d 1464, 1470 (Fed. Cir. 1993). However, one who is ordinarily

skilled in the art must "understand the <u>bounds</u> of the claims" otherwise the claim is invalid. <u>Miles Labs. v. Shandon</u>, 997 F.2d 870, 875 (Fed. Cir. 1993).

The patents are presumed valid, and defendants, as the moving parties, must present clear and convincing evidence that the claims at issue are indefinite. <u>S3 Inc. v. Nvidia Corp.</u>, 259 F.3d 1364, 1367 (Fed. Cir. 2001). In contrast, for plaintiffs to prevail on their motion (as construed) they must show that defendants cannot meet their "clear and convincing" burden. <u>Eli Lilly</u>, 251 F.3d at 962. The Court overrules defendants' objections to plaintiffs' evidence in opposition and grants plaintiffs' request for judicial notice of the Bescher declaration.

### 1. Crystal X

Defendants argue that the term Crystal X, and its chemical notation of $\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,s\ bar)\}$, is indefinite because one ordinarily skilled in the art could not understand the metes and bounds of this term. <u>Exxon Research</u>, 265 F.3d at 1376. Additional support for this contention is found in the report of the court-appointed expert, Dr. Frieder Seible and his assistant, Dr. Karen Arnett. In "technical issue 8," Ultimax asked if "The term $\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,s\ bar)\}$, or Crystal X, refers to, among other compounds, $C_4A_3Sbar$, or calcium sulphoaluminate." (Seible rpt. at 5). In response, Drs. Seible and Arnett stated that "there are over 5500 possible numerical combinations presented by this 'formula'" and that "it is not possible to conclude that Crystal X, which as stated could be multiple compounds, refers specifically to $C_4A_3Sbar$. It may

be a number of other compounds instead." (Id. at 6).

### a. The Court-Appointed Expert's role

Plaintiffs object to Dr. Seible (and to a lesser extent) Dr. Arnett's qualifications. Supp. Opp. at 3. Plaintiffs contend that because Dr. Seible is an engineer and not a chemist, he is not qualified to opine on the meaning of Crystal X. Additionally, plaintiffs assert Dr. Arnett, who is a chemist, is not qualified to offer an opinion because she was not separately appointed as an expert and her expertise in not in "solid solution mineralogy" or cement chemistry.

Defendants respond that Dr. Seible was plaintiffs' candidate for appointment, that plaintiffs' procedures for presentation of issues were adopted by the court-appointed expert, that they did not object to the additional appointment of Dr. Arnett to the team, that plaintiff posed chemistry issues to Drs. Seible and Arnett and raised objections only after the outcome of the expert opinions turned unfavorable. These points are well taken. To illustrate the point, there are other instances where Dr. Seible's chemistry conclusions are favorable to plaintiffs. (See Seible rpt. at 6, 18)[7]. In those instances, no objection is raised.

It must be noted that in a February 23, 2003 response to the Court's "Order re: Appointment of Neutral Expert," the parties did state that they believed it would be difficult to

---

[7] Plaintiffs would have the Court adopt Dr. Seible's interpretation that there should be a comma between (f, cl) in the final parenthetical of the Crystal Y formula. The presence of the comma dramatically changes the meaning of the compound and is supportive of plaintiffs' argument as to Crystal Y.

find a neutral expert in cement chemistry not already retained by the parties but that an expert could be identified to aid the Court in "areas outside cement chemistry." (2/23/03 parties response at 2). Nonetheless, the parties both subscribed to a neutral expert process which cost thousands of dollars and consumed a significant amount of time. The Court infers that the parties believed, as did the Court, that the opinions of that expert could be helpful to the Court with respect to major issues in the case. A review of the issues put before Drs. Seible and Arnett indicates that nearly all of the disputes involve cement chemistry in one way or another. Given the amount of time expended in the neutral-expert process, the appointment of Dr. Arnett, a chemist, to assist Dr. Seible, the helpful opinions thereby secured, and plaintiffs' strategic behavior of objecting only after the fact and only to selected opinions, the Court concludes that consideration of Dr. Seible's final report, along with all the other evidence presented, is proper in evaluating the instant motions. Plaintiffs' objections are overruled.

### b. The Indefiniteness of Crystal X

Turning to the merits of the motion, it is undisputed between the parties that the crystals at issue in these motions (X, Y and Z) are "solid solutions" which is part of the field of mineralogy. (Kashani supp. decl. Ex. B, Klemm depo. at 41-43). Dr. Seible states in his deposition that he clearly understands this concept. Solid solutions are crystalline compounds where various elements can substitute for one another at a particular site on the crystalline structure. (Adams rpt. at 20-21; McGraw Hill, at 1973). The ability of one element to substitute for

another is what makes a solid solution so complex. For instance, the compound $(Mg, Fe)_2$, (Mg = magnesium and Fe = iron) can have four different combinations because the Mg can substitute after the comma for Fe and vice versa. With Crystal X, the formula is much more complex: $\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,s\ bar)\}$. The number of elements in the formula means that C can be substituted by K, N and M in such a way that over 5000 possible combinations can come out of this formula. (Seible rpt. at 6).

Initially, plaintiffs argued that the formula $\{(C,K,N,M)_4(A,F,Mn,P,T,S)_3(cl,s\ bar)\}$ should be construed to mean $C_4A_3Sbar$, or calcium sulphoaluminate. As Dr. Seible notes, this is <u>one</u> possible compound out of the 5000. (<u>Id.</u>) The formula could be $C_4A_3Sbar$, but only if the following substitutions are made $(C, \cancel{K,N,M})_4(A, \cancel{F,Mn,P,T,S})_3(\cancel{cl},s\ bar)$. In the first parenthetical, C would have to substitute for K, N and M, A would substitute for F, Mn, P, T and S in the second parenthetical, and S bar would substitute for cl in the third. While this is a <u>possible</u> combination, it is not mandated by the formula. (<u>Id.</u>; <u>see also</u> Adams rpt. at 21). Moreover, as defendants point out, even if this is a possible combination, given the number of other possible combinations arising therefrom, potential infringers are not put on sufficient notice as to the bounds of the claim. <u>Honeywell</u>, 341 F.3d at 1340.

Plaintiffs attempt to refute this indefiniteness charge by directing the Court to references to the formula they call Crystal X in the prior art and by relying on declarations, in addition to other evidence, from those who are of ordinary skill in the art. <u>See</u>, <u>e.g.</u>, <u>Honeywell</u>, 341 F.3d at 1340; <u>Morton</u>

14

*Int'l*, 5 F.3d at 1470-71. However, the prior art, which is cited in the '556 patent, does little to clarify the formula.

In the '556 patent, Kunbargi cites the Klein and Ost patents which discuss the hydration of $C_4A_3Sbar$. '556 2:33-39. Plaintiffs assert that these references indicate Crystal X is actually $C_4A_3Sbar$; however, the prior art actually undercuts plaintiffs' position. It seems unlikely that a skilled chemist would use a broad formula to identify a compound already known in the prior art where it could have been more simply and clearly expressed as $C_4A_3Sbar$. The more likely scenario is that Kunbargi used a complex formula in order "to reflect the fact that $C_4A_3Sbar$ can be a solid solution with substitution of ions." (Adams rpt. at 13). Moreover, if Crystal X was defined merely as $C_4A_3Sbar$, there would be nothing novel about Crystal X in the patent. (See Bescher decl. Ex. C at 1 (Molina paper)). The '556 patent fails for indefiniteness.

As to the '684 patent, plaintiffs contend that the claims are not indefinite because defendants have a clear understanding of what Crystal X means. A defendant's understanding of the disputed claim term is relevant evidence that "the term was in use and had a discernible meaning to at least some persons in the field." Bancorp Serv., 359 F.3d at 1376. The Federal Circuit has also acknowledged, however, that "the proper test is not what the parties know but what one who is ordinarily skilled in the art would know." Id.

The evidence plaintiffs provide to show that CTS understands the term Crystal X (as well as Crystal Y) is a "testing protocol" which has been the subject of intense

discovery disputes.[8] (Kashani Ex. P). The "protocol" is a document created by CTS's expert Waldemar Klemm, which provides instructions for testing cement produced at the Juarez, Mexico plant. The protocol instructs CTS to "[a]nalyze [both clinker and cement] quantitatively for crystals X, Y and Z." (Id.)

When the evidence is viewed as a whole, plaintiff fails to put forth a workable claim interpretation for Crystal X. Dr. Seible's report, the prior art, as well as the equation in the '684 all support the conclusion that while $C_4A_3Sbar$ is one compound described by Crystal X, it is only one of thousands of possibilities. If Kunbargi intended Crystal X to mean $C_4A_3Sbar$,

---

[8] Plaintiffs argue that the test results generated by the implementation of this protocol should have been turned over pursuant to Magistrate Judge Nakazato's July 10, 2003 order ("July 10 Order"). This testing was discussed in the Klemm June 24, 2004 deposition. (Id. Ex. B at 69). Arguing that these documents would show that Crystal X and Crystal Y are definite because they are compounds for which tests can be devised, plaintiffs seek to strike all portions of defendants' motion which discuss Crystal X and Y pursuant to Fed. R. Civ. P. 37. Defendants contend that this "discovery" motion is untimely under the Court's jury trial order, that plaintiffs failed to show that the documents exist, that if they do exist they are work product, and that they are not relevant. (See defts' response to obj. to evid. 7-9).

A review of the July 10 Order indicates that the test results fall outside its scope. (Pltf. obj. Ex. E at 2). Plaintiffs' objection is based upon two interrogatories. (Id. Ex. D at 7; obj. at 15). Interrogatory no. 2 calls for all documents relating to the manufacture of clinker or cement while no. 3 seeks the production of documents "relating to testing of clinker, cement or cement-containing products..." (Id. at 7). Plaintiffs list both interrogatories in their brief and assert that Judge Nakazato ordered compliance. (Obj. at 15). The July 10 Order, however, requires a response to no. 2, but omits no. 3. (Pltf. obj. to evid. Ex. E at 2). Thus, the interrogatory which specifically addressed documents related to testing was not discussed in the July 10 Order. The Court overrules plaintiffs' objection and denies plaintiffs' motion to strike because it does not appear that the testing protocol falls within the scope of interrogatory no. 2 which called for manufacture-related, rather than testing-related, documents.

1 the claim should have been drafted to so state. Otherwise, it is

2 simply too broad to be construed and the claims fail to put

3 potential infringers on notice regarding the metes and bounds of

4 the invention. <u>Exxon Research</u>, 265 F.3d at 1376.

## 2. Crystal Y

6 Given all claims which contain Crystal Y also contain

7 Crystal X, the Court's discussion above resolves all motions for

8 invalidity. Nonetheless, the Court also addresses the issues

9 presented with respect to Crystal Y.

10 This dispute centers on a possible drafting error in

11 the '684 patent, namely, that there should be a comma between the

12 symbols for fluorine and chlorine in the formula for Crystal Y.

13 Plaintiff asserts that the omission of a comma is a drafting

14 error, and, after correction by the Court, the comma would render

15 the term and the accompanying claims definite.[9]

16 As with Crystal X, the parties made use of Dr. Seible's

17 expertise to analyze technical issues presented with Crystal Y.

18 Ultimax presented the formula for Crystal Y to Dr. Seible and

19 asked whether the formula, after correction, was the same as a

20 compound listed on "card 45-009" as published by the

21 International Centre for Diffraction Data (ICDD). (Seible at 6;

22 Adams decl. ¶¶ 16-18). Dr. Seible answered in the negative. The

23 formula for Crystal Y is $C_9S_3Sbar_3Ca(f\ cl)_2$. <u>See, e.g.</u>, '684 claim

24

_____

25 [9] Plaintiffs' assertion is not surprising in light of the
numerous drafting errors contained within the '684 patent. On
26 April 17, 2001, a certificate of correction was issued for the
formula for Crystal Y. (<u>See</u> '684 last page). The corrected
27 formula for Crystal Y found in the claims of the '684 is
$C_9S_3Sbar_3Ca(f\ cl)_2$.
28

1. The formula on Card 45-009 is $Ca_{10}(SiO_4)(SO_4)_3F_2$. (Seible at 6). While Crystal Y does not call for the breadth of substitutions as is present with Crystal X, Dr. Seible concluded that it could still refer to at least two compounds other than the one listed on the ICDD Card. (Id.). Thus, he could not conclude that Crystal Y referred "specifically" to $Ca_{10}(SiO_4)(SO_4)_3F_2$ (the Card's formula).

However, based on Dr. Seible's evaluation, the formula for Crystal Y references a much smaller universe of possible compounds (three) as compared to Crystal X (five thousand). Necessarily, the potential metes and bounds of this portion of the invention are much more focused than with Crystal X. Miles Labs., 997 F.2d at 875 (Fed. Cir. 1993). Potential infringers need only be aware of a handful of formulae rather than the numerous potential combinations expressed in the notation for Crystal X.

As the formula for Crystal Y is currently written, there is no comma between the f (fluorine) and cl (chlorine). ('684 2:4-6). In cement chemistry, this means that both fluorine and chlorine must be present in the compound. A comma changes the possible makeup of the formula allowing for the presence of either fluoride or chloride or both, but not requiring the presence of both molecules. (Adams decl. Ex. 2 at 15). Defendants argue that the formula should be read as is and that in this form it is indefinite. Plaintiffs assert that one who is ordinarily skilled in the art would recognize, as did Dr. Seible, that there should be a comma between f and cl. (Seible at 6; Adams decl. Ex. 2 at 15).

The Court can correct obvious typographical errors or "Essex errors" only if: "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation." Novo Indust., 350 F.3d at 1357. These factors overshadow the understandings of one who is skilled in the art, and here, they militate against finding the absence of a comma as a typographical error. Cf. Winn Corp., 272 F. Supp. 2d 968, 981 (C.D. Cal., 2003).

Both the corrected specification and the claims as stated in the provided portion of the file wrapper do not show a comma between the f and cl. ('684 5:31 as corrected; Baskin decl. Ex. 8 at 72). Strikingly, the formula for Crystal Y set forth in the pre-corrected specification actually contained a comma between the f and cl, but the certificate of correction fails to reflect this. ('684 5:31 pre-correction). While a comma is present in an alternative version of the Crystal Y formula in the specification, the post-correction formula in the specification, as well as the patent's claims, lack a comma. (Id.)

The Novo Indust. factors weigh in favor of adjudicating the motion according to the patent's current claim, which lacks a comma between fluorine and chlorine. One of the preferred embodiments (Example I) lists a number of required compounds but both f and cl are absent. ('684 13:5-12). Under plaintiffs' interpretation, all embodiments should contain either f, cl, or both. Example II lists only F. (Id. 14:13).

Because there is a "reasonable debate" as to the proper

formulation of Crystal Y and "the nature of the error is not apparent from the face of the patent," the Court lacks authority to correct the patentee's drafting error. <u>Novo Indust.</u>, 350 F.3d at 1357.

Plaintiffs fail to offer a definite claim interpretation if the Court declines to correct the alleged error. (Adams decl. Ex. 2 at 15). If no comma is added, plaintiffs' preferred construction that Crystal Y is the same mineral as found on Card 45-009 is untenable. The formula for Card 45-009 contains no chlorine, which would be a required component according to the formula as currently written. (Seible at 6). As defendants maintain, $C_9S_3Sbar_3Ca(f\ cl)_2$ corresponds to no known mineral. (Klemm decl. Ex. 1 at 16). Crystal Y (without a comma) is an indefinite term. Thus, defendants' motion for invalidity based on indefiniteness as to Crystal Y is also well taken.

### 3. Compression Strength

Defendants seek to invalidate claims 9-11 of the '556 patent, claim 17 of the '684 patent and claims 10-11 of the '534 patent. CTS argues that these claims are indefinite because compression strength of concrete is in part determined by the test employed. The '684 and '534 patents do not state which test should be used and the '556 patent omits key variables of the C109 test which can impact the resulting psi reading.

In response, Ultimax contends that "compression strength" in the '684 patent refers to the ASTM modified C109 cube strength test as stated in 9:47-54 of the '556 patent. The neutral expert, however, disagreed with this interpretation, and

20

instead, Dr. Seible adopted the dictionary definition, which states that "compression strength is the ability of a material to withstand compressive forces." (Seible at 5). According to Dr. Seible, "compressive strength is not determined by the ASTM modified C109 test, nor does it need to refer to the ASTM test." (Id.) He also noted that the '556 patent was confusing because its reference to "molar composition"[10] is nonsensical in the context of discussing the ratio of cement and sand. ('556 9:51-52).

While the Court finds that there are genuine issues of fact for trial regarding compression strength, the claims at issue are not so "insolubly ambiguous" as to prevent a proper claim construction. Honeywell Int'l, 341 F.3d at 1339. Both the specifications of the '684 and the '534 refer to the '556 patents procedures when discussing the measurement of compression strength. '684 5:47; '534 6:15-19. Direct references to prior art in a patent may be examined to aid in the construction of the disputed term because they are often indicia of the meaning of the term to one of ordinary skill in the art. Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1045 (Fed. Cir. 2000).

The '556 does describe a test for measuring compressive strength. '556 9:47-53. It calls for the use of the "modified C109-cube strength test" and it provides time/compressive strength results for the cement taught by Example I of the '556. Id. This is distinct from the "standard ASTM procedure C109" referred to earlier in the specification. '556 1:55-56. There

---

[10]    Plaintiffs contend that "molar" is a typographical error which should properly read "mortar."

are key differences between the "modified" and the "standard" tests. The latter has a specific cement to sand ratio, whereas the former allows for adjustments to both the cement to sand and water to cement ratios. (Baskin decl. Ex. 9 ¶¶ 4-6, Ex. 11). The '556 provides these necessary modifications. The cement to sand ratio used to produce the reported compressive strengths in the table is 1:1 while the water to cement ratio is 1:3. '556 9:47-51.

Additionally, Ed Rice testified during his deposition that the defaults for the modified C109 test provided much of the necessary information for assessing compressive strength. (Kashani decl. Ex. KK at 128-30). He stated that the "109" provided both the water to cement and the sand to cement ratios. (Id.) It is unclear, however, if the default ratios that Rice testified about are the same as provided for in the '556 patent. Defendants' expert contends that they are different, but his arguments seem to address the workability of the testing procedure rather than the adequacy of the information provided. (Klemm decl. Ex. 1 at 10-11). Although the prior art does not specify a particular test for measuring compressive strength, the prior art does indicate that one of ordinary skill in the art could determine the compression strength even where no test is disclosed, so long as the appropriate ratios are provided.[11] Here, not only is a test provided but the "modified" ratios of cement to sand and water to cement are also given. Thus, while

---

[11] For example, the Beretka article, which discusses "calcium sulphoaluminate cements" and is thus is within the relevant art, does not mention a particular test. (Bescher decl. Ex. C at 3). Instead, the article provides a water to sand ratio. (Id.)

plaintiffs have taken inconsistent positions as to the meaning of "compressive strength," the term is not so overly broad as to defy proper construction. Likewise, the term does not fail to put potential infringers on notice. Honeywell Int'l, 341 F.3d at 1339. Thus, in the context of the disputed claims, the Court finds that the term "compressive strength" means the ability of cement to withstand compressive forces as reflected by the testing procedures set forth in the '556 patent at 9:47-53. The Court thus rejects defendants' motion on § 112, ¶ 2 grounds as to compression strength.

**C.      Defendants' Motion for Declaration of Non-Infringement**

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1999). The Court may grant summary judgment where there is no dispute regarding the functioning of the technology and the application of the properly construed claims does not create additional disputes. Weiner v. NEC Elec., 102 F.3d 534, 540 (Fed. Cir. 1997).

At issue here is the term "anhydride" used in claims 9-11 of the '556 patent. Specifically, the claims refer to "soluble $CaSO_4$ anhydride." Defendants argue that since their cement contains no anhydride, there can be no infringement. Plaintiffs assert that one of ordinary skill in the art would

know that, as used in claims 9-11, anhydride actually means anhydride. As this latter compound is found in defendants' cement, plaintiffs contend the motion should be denied.

The ordinary meaning of anhydride and anhydrite belies plaintiff's claim. There is a "heavy presumption" that claims carry their "ordinary meaning" as understood by one of ordinary skill in the relevant art. Hoganas AB v. Dresser Indust., Inc., 9 F.3d 948, 951 (Fed. Cir. 1993); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). An interpretation should not deviate from a claim's "ordinary meaning" unless (1) the patentee has chosen to be his own lexicographer and has specifically defined the term in the specification; (2) if the patentee distinguished the term from the prior art on the basis of a specific embodiment; and (3) applying the ordinary meaning to the disputed claim would deprive the claim of "clarity" thus requiring the examination of other intrinsic evidence. Id.

Neutral expert Dr. Seible describes in his report anhydride and anhydrite as two very different chemical compounds. (Seible rpt. at 17-18). Anhydride is "a compound formed from an acid by removal of water." (Id. at 18; McGraw Hill at 103. In contrast, anhydrite, which is also known as "anhydrous calcium sulphate, or anhydrous CaSO$_4$" is calcium sulphate without water. McGraw Hill provides a similar definition: "CaSO4: A mineral that represents gypsum without its water of crystallization..." (Id.)

Nowhere in the teachings of patent '556 is there a discussion of forming a compound from an acid by removal of its water. While plaintiffs point to instances where defendants have

24

used the term anhydride where they likely meant anhydrite, and to Dr. Seible's observations that "given the context in which 'anhydride' is used in Patent '556, claims 9-11, it is not unreasonable to assume that the author meant anhydrite and *not* anhydride." (Seible rpt. at 18), the ordinary meaning of anhydride is not altered. Moreover, with respect to anhydride, Kunbargi did not elect to be his own lexicographer for there is no definition of the term provided in the specification or the prosecution history. There is no evidence that "anhydride" was distinguished from the prior art in any way.

Plaintiffs' argument that one of ordinary skill in the art would know that the reference to anhydride meant anhydrite is unavailing. Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1349 (Fed. Cir. 2002). In Bartell the Federal Circuit refused to read the term "perpendicular" to mean "parallel" in order to preserve the validity of the patent, even where plaintiff asserted that one skilled in the art would have understood perpendicular to mean parallel in the context of the claims. Id. Likewise, the Court declines to substitute terms merely because one skilled in the art might realize the claim intends to refer to anhydrite instead of anhydride.

While plaintiffs do not specifically state that the reference to anhydride was a typographical error or an outright mistake, it is apparent that they would like the patent to read "anhydrite." This is clear from the numerous references to $CaSO_4$ anhydrite (rather than anhydride) in the issues posed to Dr. Seible. (See, e.g., Seible rpt. at 4). The Federal Circuit permits the correction of "obvious minor typographical errors in

patents" in limited circumstances; however, the court cautions against redrafting claim terms, even where necessary to avoid a strange result. <u>Novo Indust. v. Micro Molds Corp.</u>, 350 F.3d 1348, 1357 (Fed. Cir. 2003); <u>Bartell</u>, 299 F.3d at 1349 (Fed. Cir. 2002); <u>Chef America, Inc. v. Lamb-Weston</u>, 358 F.3d 1371, 1374 (Fed. Cir. 2004). The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity...[e]ven a nonsensical result does not require the court to redraft the claims." <u>Id.</u> (internal quotations and citations omitted). In <u>Chef America</u>, the Court refused to rewrite a claim "heating batter-coated dough to a temperature in the range of about 400 degrees F. to 850 degrees F" to refer to the oven rather than the temperature of the dough, even where it meant that following the teachings of the claim would result in the dough being "burned to crisp" rather than exhibiting a "light, flaky, crispy texture" as called for in the specification. <u>Id.</u> The Court stated "in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it." <u>Id.</u>

Here, it seems that Kunbargi may have intended to write anhydrite rather than anhydride. Anhydrites are compounds that are part and parcel of the high-strength cement world - soluble $CaSO_4$ - whereas an anhydride could be present, but there is little discussion of forming compounds from acids by removing water. Tellingly, the term anhydrite is <u>not mentioned</u> in the '556, nor can plaintiffs point to any portion of the specification or the prosecution history to support their

contention. Cf. Winn Incorp. v. Eaton Corp., 272 F. Supp. 2d 968, 981 (C.D. Cal. 2003). Because the issue is non-infringement and not invalidation, this ruling is consistent with the maxim that claims should be interpreted to preserve their validity. See Modine Mfg. Co. v. United States Int'l Trade Commission, 75 F.3d 1545 (Fed. Cir. 1996). In accordance with the prevailing line of Federal Circuit cases, the Court declines to redraft the claims and finds instead that the ordinary meaning is applicable. Consequently, because CTS cement does not contain anhydride, CTS has not infringed the patent, and CTS motion for summary judgment on grounds of non-infringement is granted.

**D.        Motions Re:  Laches, Equitable Estoppel & Shop Rights**

The parties have also submitted cross motions for summary judgment regarding defendants' defenses of laches, equitable estoppel and shop rights. As an initial matter, plaintiffs argue that defendants are precluded from asserting the invalidity of the '556 patent. Plaintiffs contend that defendants' never asserted the invalidity of the '556 in their interrogatory responses. In fact, defendants' Answer to plaintiffs' Second Amended Complaint asserts an affirmative defense of invalidity against all three patents in suit (Answer at 7 ¶ 2). Accordingly, the Court considers the merits of the motion.

**1.    Laches**

The equitable defense of laches is cognizable under 35 U.S.C. § 282 and its application is "accorded to the sound discretion of the district court." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992); see

Chisum § 19.05.  Laches offers a defense to infringement which has occurred _prior_ to the filing of the suit.  Chisum § 19.05. To establish a defense of laches, defendant has the burden of showing:  (1) plaintiff has delayed filing suit for an unreasonable time after he knew or should have known of his infringement claim (but no earlier than the date the patent issued); and (2) the delay prejudices the defendant.  _Aukerman_; 960 F.2d at 1032.  Prejudice may be evidentiary - the loss of documents or witnesses' memories over time - or economic - the loss of monetary investments which would have been prevented via an earlier suit.  _Id._

A presumption of laches arises from "a more than six-year delay in filing suit."  _Id._  Defendant makes out a _prima facie_ defense of laches upon proof that the patentee delayed more than six years from the date he knew or should have known of defendant's infringement.  "In determining the date of constructive knowledge, a patentee is charged with such knowledge as it might have obtained upon inquiry, provided the facts already known to it were such as to put upon a man of ordinary intelligence the duty to inquire."  _R2 Med. Sys. v. Katecho_, 931 S. Supp. 1397, 1409-10 (N.D. Ill. 1996) _quoting_ _Advanced Cardiovascular Sys, Inc. v. SciMed Life Sys., Inc._, 988 F.2d 1157, 1162 (Fed Cir. 1993) (internal quotation omitted).  Absent this presumption, a defendant may still prevail by showing unreasonable delay and prejudice, but with the presumption "these facts _must_ be inferred, absent rebuttal evidence."  _Id._ at 1037. The presumption does not shift the burden of proof to the patentee, but rather "vanishes upon introduction of evidence"

demonstrating a reasonable delay or the lack of prejudice.  _Id._
Once the presumption is destroyed, unreasonable delay and
prejudice "must be proved and judged on the totality of the
evidence presented."  _Id._

The presumption of laches, however, does not mandate a
finding for defendant.  _Id._ at 1036.  Rather, the presumption
lays "the foundation for the trial court's exercise of
discretion.  Where there is evidence of other factors which would
make it inequitable to recognize the defense despite undue delay
and prejudice, the defense may be denied."  _Id._ at 1036.  Such
evidence may include conscious copying of the patent-in-suit.
_Id._ at 1033.

Plaintiffs argue that Kunbargi was not on notice of
CTS's infringing activities because it was not possible to
"reverse engineer" CTS Rapid-Set cement to determine if it
infringed the '556.  (Kunbargi decl. ¶ 60).  Kunbargi also
maintains he hired a private investigator in 1997, but the
results of that investigation were not conclusive.  (_Id._ ¶ 59).
Finally, plaintiffs maintain that Rice assured Kunbargi that
CTS's products did not infringe the '556 patent.

The obligation falls to a patentee to police the
marketplace in order to protect his patent rights.  _Wanlass v._
_General Electric Co._, 148 F.3d 1334, 1339 (Fed. Cir. 1998).
Based upon his relationship with Rice, Kunbargi was on inquiry
notice regarding defendants' accused cement from the date of the
issuance of the '556.  Plaintiffs concede that Kunbargi
"demonstrated his invention to Rice" and, in July of 1988, he
applied this invention to the clinker produced from the so-called

29

"Burn One" at the Heartland facility in order to form rapid hardening cement. (Kunbargi decl. ¶¶ 14, 39). Additionally, letters between Kunbargi and Rice indicate that "new cement" was created while Kunbargi was affiliated with CTS. (Rice decl. Ex. 6 at 20; Ex. 10).

CTS's competition in the rapid hardening cement market should have heightened Kunbargi's vigilance. Wanlass, 148 F.3d at 1340. Plaintiffs provide no evidence regarding the scope of the private investigator's inquiry, just that one occurred. (Kunbargi decl. ¶ 59). Plaintiffs' assertion regarding the inability to reverse engineer the '556 is also unavailing. While the feasibility or expense of testing is a factor in determining if a patentee conducted an adequate investigation, hiring a private investigator once during the twelve-year period prior to filing suit does not fulfill Kunbargi's obligations. Wanlass, 148 F.3d 1339-40. Additionally, if Kunbargi was concerned about the method claims of the '556, he could have investigated CTS's production processes for Rapid Set. The record indicates plaintiffs made no inquiry. The friendly notes written by Rice to Kunbargi, and Kunbargi's bare assertions that Rice maintained that CTS was not using "soluable anhydrite" in Rapid Set, are insufficient to contradict the other evidence that demonstrates that plaintiffs should have been on inquiry notice from the date of the issuance of the '556 patent in 1990. Moreover, defendants offer the Collins declaration in which he states that Kunbargi expressed his intent to sue CTS as early as 1997, but was waiting for Rice to build up the business. (Collins decl. ¶¶ 2-4).

Given the twelve-year delay between the issuance of the

patent and the filing of the present suit, and the fact that plaintiffs were on inquiry notice of potential infringement well before 1997 when plaintiffs admit Kunbargi contemplated filing suit, prejudice is presumed. Plaintiffs' conclusory assertions that defendants have kept backup files from Burn One and that the two witnesses who have become unavailable could not offer relevant testimony do not adequately rebut this presumption. (See Rice decl. ¶ 17). Specifically, plaintiffs fail to demonstrate that the destruction of records from Burn One and the loss of testimony from John Bush, the former head of the CTS lab during Kunbargi's tenure, is not prejudicial. (Id. ¶¶ 17-18). These assertions are insufficient to create a genuine issue as to laches, particularly given the length of the delay. Auckerman, 960 F.2d at 1039. While evidence of inequitable conduct can defeat the application of laches, the record demonstrates that defendants do not willfully infringe claims 9-11 of the '556, based on the Court's interpretation of those claims. Id. 960 F.2d at 1039. CTS' objections to plaintiffs' evidence in opposition are overruled. The Court thus grants defendants' motion with respect to laches and denies plaintiffs' cross motion.

## 2. Equitable Estoppel

Equitable estoppel is a complete defense to an infringement suit. Chisum § 19.05[3][a]; Aukerman, 960 F.2d at 1041. Estoppel is established where: (1) defendant demonstrates a misrepresentation; (2) reliance; and (3) prejudice (economic or evidentiary). Id. While "silence alone will not create estoppel unless there is a clear duty to speak" the Court must focus on

31

whether the patentee's conduct "reasonably gave rise to an inference" of non-enforcement of the patent-in-suit. Id. Plaintiff may defeat a motion for summary judgment by demonstrating a genuine factual issue with respect to any of these prongs. Id. at 1043.

Defendants' motion relies heavily on ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1064 (Fed. Cir. 1995). There, the court found that the long delay after defendant denied infringement, combined with "other factors," gave rise to an estoppel defense. Id. The court found that the circumstances of the relationship between the licensor and defendant, including negotiations between the licensor and defendant with respect to other patents, allowed defendant to conclude that the patent would not be asserted against it. Id.

Here, CTS argues that, given the close relationship between the parties, Kunbargi's failure to respond to Rice's April 16, 1990 letter wherein he sought a meeting to discuss "the ownership of certain technologies" gave rise to a reasonable belief that the '556 patent would not be asserted against it. The elements present in ABB Robotics, such as continued negotiations between the parties, are absent here. An estoppel defense where the potential infringer initiates the contact is not readily supportable by the case law, even where the parties had a mentor relationship. Defendants' estoppel defense lacks merit, and thus, plaintiffs' motion is granted.

### 3. Shop Rights

Shop rights are doctrinally rooted in the concepts of implied license and equity. They provide an employer with "a

nonexclusive, royalty-free, nontransferable license" to practice the patent when an employee used the employer's resources "to conceive of an invention or to reduce it to practice." Chisum § 22.03[3]. A shop right is not a true ownership interest, but rather operates as a defense to a claim of infringement. The classic shop right scenario is found when an employee (1) develops an idea during work hours for which he was compensated; (2) uses his employer's resources or facilities and his time at work to produce an embodiment of the invention; and (3) introduces the embodiment into his employer's facilities. Id.; Francklyn v. Guilford Packing Co., 695 F.2d 1158, 1160-61 (9th Cir. 1983) (finding that a shop right need not arise out of employer-employee relationship alone). All three elements need not be satisfied for a shop right to be established. Though often applied in the context of patent law, a "shop right" arises under state law. Chisum § 22.03[4]; see McElmurry, 995 F.2d at 1581.

There are cross motions on this issue, and several disputed factual issues preclude summary judgment. Of crucial importance is the time when the invention was reduced to practice. Reduction to practice occurs where an inventor determines that his invention would work for its intended purpose. Slip Track Sys., Inc. v. Metal Lite, Inc., 304 F.3d 1256 (Fed. Cir. 2002).

Here, there are factual disputes surrounding when and where Kunbargi conceived of and reduced to practice the inventions which are now embodied in claims 1, 2 and 9-11 of the '556 patent. At the very least, Kunbargi's UCLA lab notes

indicate that he had not reduced to practice the invention at that time. (Kashani decl. Ex. C. See, e.g., statements: "what has happened is not clear yet" and "I think the following reaction happened"). Kunbargi states that he formed cement composition matching claims 9-11 in 1985 prior to his arrival at CTS (Kunbargi ¶ 13). However, there is also evidence in the form of a flurry of letters between Rice and Kunbargi discussing the creating of a "new cement," suggesting that reduction to practice did not occur until Burn One at the Heartland facility. (Rice decl. Ex. 6 at 18, 20).

Similarly, the scope of Kunbargi's duties while employed at CTS and whether he was "employed to invent," such that any new cement produced at Burn One would be impliedly assigned to CTS, is a disputed factual issue. While Ultimax contends that the agreement is negated by CTS's failure to give the mandatory notice of inventor's rights as required by the California Labor Code § 2872, any assignment was not embodied in a written employment agreement or contract and thus this statutory provision is inapplicable. Plaintiffs arguments regarding statute of frauds is equally unavailing. Because any assignment would be a judicially-created fiction and not based on an oral agreement for services that could not be performed within one year, the statute of frauds does not apply. The parties' motions for partial summary judgment of defendant's shop rights defenses are denied.

## V.

### CONCLUSION AND TRIAL SETTING

For the foregoing reasons, the Court: (1) grants

34

defendants' Motion for Summary Judgment for Invalidity and
Indefiniteness as to the '684 patent; (2) grants defendants'
Motion for Partial Summary Judgment of Non-Infringement as to the
'556 patent; (3) grants CTS's Motion for Summary Judgment on Non-
Technical Grounds as to the '556 patent, ruling that laches bars
prosecution of the '556 patent, but otherwise denies the parties'
motions for partial summary judgment on defendants' remaining
equitable defenses of alleged agreement to invent and shop
rights; and (4) denies plaintiffs' Motion for Partial Summary
Judgment on Patent Validity and Enforceability.  Defendants'
proposed Statement of Uncontroverted Facts and Conclusions of Law
as to the first motion has been modified, signed, and filed; the
remaining proposed Orders and Statements of Uncontroverted Facts
and Conclusions of Law have been ordered placed in file, not
used.

     IT IS SO ORDERED.

     IT IS FURTHER ORDERED that trial on the remaining
claims and defenses is hereby scheduled for March 1, 2005, at
9:00 a.m.  Pretrial Conference is hereby scheduled for February
7, 2005, at 2:00 p.m.  The hearing on the motions in limine is
hereby scheduled for February 18, 2005 at 1:30 p.m.

     IT IS FURTHER ORDERED that the Clerk shall serve a copy
of this Order on counsel for all parties in this action.

     DATED: December _6_, 2004.


ALICEMARIE H. STOTLER
UNITED STATES DISTRICT JUDGE