JAMES W. GERIAK, SBN 32871
THOMAS J. GRAY, SBN 191411
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614
Tel: (949) 567-6700
Fax: (949) 567-6710
Email: jgeriak@orrick.com
        tgray@orrick.com

RICHARD C. LEONARD, SBN 48193
LEONARD, DICKER & SCHREIBER
Limited Liability Partnership
9430 Olympic Boulevard, Suite 400
Beverly Hills, California 90212-4519
Tel: (310) 551-1987
Fax: (310) 277-8050
Email: rleonard@ldslaw.com

Attorneys for Defendants and Counterclaimant

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ULTIMAX CEMENT MANUFACTURING CORP., et al.,<br><br>          Plaintiffs,<br><br>vs.<br><br>CTS CEMENT MANUFACTURING CORP., d/b/a CTS CEMENT MANUFACTURING CO., et al.,<br><br>          Defendants.<br><br>AND RELATED COUNTERCLAIM | CASE NO.: SACV 02-578 AHS (ANx)<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING REGARDING U.S. PATENT NO. 4,957,556; DECLARATION OF RICHARD C. LEONARD**<br><br>Date: December 17, 2010<br>Time: 1:30 p.m.<br>Place: Courtroom 6B<br>Judge: Hon. Alicemarie H. Stotler |

LEONARD,
DICKER &
SCHREIBER
Limited Liability
Partnership

1

1. **INTRODUCTION**

Defendants' Motion to Dismiss is based on the fact that Plaintiff Hassan Kunbargi executed a Patent Agreement (the "Agreement") with the Regents of the University of California (the "University"), pursuant to which he agreed that every process or product (an "Invention"), which he developed while using the University's research facilities, would belong to the University. Moreover, if the University decided to patent the Invention, Kunbargi agreed to cooperate with that effort. Kunbargi violated the Agreement by failing to disclose the Invention that eventually resulted in the '556 Patent. Accordingly, Kunbargi did not own the Invention that became the Patent and does not have standing to bring this action.

Kunbargi responds in shotgun fashion, claming that: (i) he did not have to disclose the Invention to the University, because he was not employed by the University, even though he signed the Agreement which provided that it did apply to him; (ii) he did disclose the Invention to Ed Rice, who, for some unknown reason, Kunbargi believes was a stand in for the University of California Board of Patents or Patent Administrator; and (iii) his breach of the Agreement by assigning the patent rights in the '556 Patent to K A Group excused his performance under the Agreement.[1]

These arguments simply do not work. Kunbargi did have an obligation as a graduate student using UCLA's research facilities to disclose the Invention to the University, which he did not do. Moreover, the University did and does own the rights to the Invention. Even though the University might have later needed a written assignment of the patent

---

[1] In support of this argument Plaintiffs place substantial reliance (it is cited no less than ten times in the opposition papers) on *Board of Trustees of Leland Stanford University v. Roche Molecular Systems*, 583 F. 3d 832 (Fed. Cir. 2009). However, the Supreme Court has granted certiorari in that action (__ S. Ct. __, November 1, 2010).

LEONARD, DICKER & SCHREIBER
Limited Liability Partnership

rights from Kunbargi if it decided to patent the Invention, the Invention always belonged to the University.

## 2. THE UNIVERSITY OWNS THE INVENTION; KUNBARGI BREACHED HIS OBLIGATIONS TO THE UNIVERSITY UNDER THE PATENT AGREEMENT

### 2.1 The Agreement Consists Of Both The Portion Labeled Agreement And The Patent Policy Of Which It Is A Part

The Agreement Kunbargi signed consists of both the portion labeled "Patent Agreement" and the portion identified as "University Policy Regarding Patents." This fact has already been determined by a California court in a case cited by Plaintiffs—*Shaw v. Regents of the University of California*, 58 Cal. App. 4th 44, 47, 54 (1997). The plaintiff in *Shaw* was a UCLA professor who signed the exact same form of agreement that Kunbargi signed. The appellate court was asked to determine if the University had the right to alter the Patent Policy after the fact to reduce the royalty owed to the plaintiff. In order to adjudicate the rights of the parties, the court was required to interpret the contract and determine what documents made up the contract, i.e. was the Policy Regarding Patents part of the Agreement. The appellate court answered this question in the affirmative ("the patent agreement between Shaw and the University is a contract which incorporates the terms of the patent policy in effect at the time Shaw was hired"):

> Our review of the patent agreement persuades us that, when Shaw signed the agreement, the parties intended it to incorporate the Patent Policy. The patent agreement (1) directs Shaw to "Please read the Patent Policy on reverse side and above," and (2) states that, in signing the patent agreement, Shaw is "not waiving any rights to a percentage of royalty payments received by University, as set forth in University Policy Regarding Patents[.]"
>
> Not only is reference to the Patent Policy "'clear and unequivocal,'" and its terms " 'easily available to the contracting

parties'" (*Williams Constr. Co. v. Standard-Pacific Corp., supra*, 254 Cal.App.2d at p. 454), the language we have italicized above expressly defines the "percentage of royalty payments received by [the] University" that Shaw may expect to receive on his invention as that which is "set forth in" the Patent Policy, i.e., 50 percent of net royalties and fees.

Accordingly, in interpreting the Agreement we must look to both the language of the Patent Policy and the language of the Agreement.

### 2.2 The Agreement Establishes That Kunbargi's Invention Is Owned By The University

**First,** Kunbargi argues that because he was not an employee of UCLA and because he "paid" for the use of UCLA's equipment, the Agreement does not apply to him [Opp., 2:21-25]. This is mere foolishness. The Agreement expressly states that it is "...made by [Kunbargi] with The Regents of the University of California...In part consideration of my ... utilization of University research facilities." It further provides that: "I agree to be bound hereunder for and during any periods of employment by University or for any period during which I conceive or develop any invention during the course of my utilization of any University research facilities." In fact, the Policy expressly states that it is mandatory not only for employees, but: "... for persons not employed by the University but who use University research facilities..." [Policy at ¶4].

Kunbargi admitted in his previously filed Declaration in opposition to the shop right motion that: "I did this work in the UCLA laboratory on my own time with materials I purchased with my own funds from an outside supplier. I also paid for the use of the laboratory (included in my tuition as a graduate student)" [Ex. 3 to the moving papers at ¶13]. Kunbargi's claim that by paying tuition he effectively divested UCLA of ownership of its research facilities ("As such the equipment was hired and properly speaking did not belong to the University at the time" [Opp., 10:10-11]) is mere foolishness.. "Properly

speaking," UCLA always owned its research facilities and Kunbargi's payment of tuition did not change the fact that Kunbargi has admitted to using UCLA'S facilities. That should end any debate about ownership.

**Second,** the Agreement clearly required Kunbargi to disclose the Invention to the University. Paragraph 5 of the Patent Policy provides that an inventor is obligated to "...promptly report and fully disclose the conception and/or reduction to practice of potentially patentable inventions to the Patent Administrator."

Kunbargi's attempt to claim that he did make this disclosure by informing Ed Rice of the Invention is unpersuasive [Opp., 2:13-14; 4:20-21 and 27-28]. The Agreement expressly requires that: "[t]hose individuals who have so agreed to assign **inventions and patents** shall promptly report and fully disclose the conception and/or reduction to practice of potentially patentable inventions **to the Patent Administrator**." Ed Rice is not the Patent Administrator.[2]

**Third,** the Patent Policy makes it clear that the ownership in the Invention belongs to the University. The Patent Policy provides, in relevant part, that:

---

[2] In fact, Kunbargi has long taken the position that Mr. Rice was in no way associated with the University. Kunbargi testified as follows in the trial of the state court action:
Q: You needed to have a faculty advisor for your graduate work, did you not?
A: I was a graduate already at that time.
Q: Didn't you still need to have a graduate advisor to assist you?
A: Yes.
Q: And Mr. Rice was appointed as an adjunct professor in the engineering department?
A: Never.
Q: "Never?"
A: No.
Q: You never worked under Mr. Rice at UCLA?
A: He lied. He never been an adjunct professor at UCLA during my time. He tried and they tried to let him in, and they rejected his credential.
Reporter's Transcript of Proceeding, June 24, 2008, at 84:19-85:8 (a copy of which is attached as Exhibit 7).

Leonard, Dicker & Schreiber Limited Liability Partnership

5

      3. The Board of Patents shall have the following powers and duties, which may be delegated in whole or in part to the Patent Administrator:

      a. To evaluate inventions and discoveries for patentability, as well as scientific merit and practical application and, where desirable, to appoint a committee of experts to examine the merits of each potentially patentable invention and to cause such committee to report its findings to the Board of Patents.

      b. To authorize applications for patent and to retain patent counsel, in association with the General Counsel, for matters pertaining to the filing of patent applications, the prosecution thereof, and the litigation that may arise therefrom.

      c. To determine the patent and related rights or equities held by The Regents in an invention, and to negotiate agreements with cooperating organizations, if any, with respect to such rights or equities.

      d. In the absence of overriding obligations to outside sponsors of research, **to release patent rights to the inventor** in those circumstances, (i) **where the Regents elect not to file a patent application** and the inventor is prepared to do so, and where no further research or development to develop that invention will be conducted involving University support or facilities, subject to a shop right being granted to The Regents, or (ii) where the equity of the situation clearly indicates such release should be given.

      e. To negotiate licenses and related agreements with other parties concerning patent **and related property rights held by The Regents.**[3]

It is clear from the language of the Patent Policy that the University owns the Invention and has the right, but not the obligation, to try and patent it, if it determines that a patent is appropriate. In this regard, the University's use of the phrase "inventions and patents" is very important, because it draws a distinction between Inventions, that may be patentable, and patents. Accordingly, even if the University determined that it did not want to seek patent protection for the Invention, the University still owned the intellectual property rights, which, in its discretion, it could **release** to the inventor. What rights would the University be releasing if it did not own the underlying rights?

---

[3] Unless otherwise indicated, all emphasis in this Reply has been added.

LEONARD, DICKER & SCHREIBER Limited Liability Partnership

**Finally,** if the University decides to proceed with a patent application, the inventor is required to "...execute such declarations, assignments, or other documents as may be necessary in the course of invention evaluation, patent prosecution, or protection of patent rights, to assure that title in such inventions shall be held by The Regents or by such other parties as may be appropriate under the circumstances." This language clearly demonstrates that the University is the current owner of the intellectual property.

This concept of ownership in the underlying rights is carried forward in the Agreement, which provides, in pertinent part, that:

> University may relinquish to me all or a part of its right to any such invention, if, in its judgment, the criteria set forth in the Policy have been met.

Once again, this language establishes that as soon as the Invention is created, it is owned by the University, which **"may relinquish"** to the inventor **"all or a part of its right to any such invention."**

### 2.3 The Fact That Kunbargi Never Was Asked To Assign The Patent To The University Does Not Defeat The University's Ownership

Kunbargi begins his Opposition by arguing that Defendants' Motion is "not even close," because "[t]he patent was never assigned to UCLA and UCLA never asked for an assignment" [Opp., 1:2-3]. How could UCLA ask for something to be assigned to it if it was unaware of the Invention as a result of the inventor's breach?

Kunbargi further argues that the Agreement simply constitutes an "agreement to assign," and not an automatic assignment [Opp, 1:13-14]. As a result, Kunbargi claims his assignment to K A Group puts legal title in the Patent with K A Group. While there is

some support for Kunbargi's claim that the patent rights need to be formally assigned to the University, that does not defeat the University's ownership of the underlying intellectual property. As noted above, the rights to the underlying intellectual property all belonged to the University from day one. The University, had it been made aware of the Invention, as required, could have decided to seek a patent on it, and, if it did, it had the right to require Kunbargi to execute any necessary documents, including an assignment. However, the lack of the assignment is not the issue. The University owns the underlying intellectual property rights and had the right to determine if it wished to patent them or release them to Kunbargi. Moreover, even if Kunbargi refused to sign the assignment he was contractually required to sign, the University could have patented the Invention without him. See, 35 USC §118; *American Cyanamid Co. v. Ladd*, 225 F. Supp 709, 711 (D.C.D.C. 1964) ["Moreover, Section 118 states that when an inventor refuses to execute or cannot be found or reached, a person to whom the inventor has assigned or agreed in writing to assign the invention, or who otherwise shows sufficient proprietary interest in the matter, may make application for Letters Patent"].[4]

Finally, Kunbargi's reliance on the assignment to K A Group as defeating the University's rights is misplaced. If all the rights to the patent remained with K A Group, it (not Kunbargi) may have an argument. However, K A Group was obviously just a stand in for Kunbargi, because K A Group reassigned to Kunbargi all of its "claims and rights to recover damages relating to the '556 Patent [see, Exhibit 8]. Because Kunbargi now holds those rights, he still has an obligation to transfer them to UCLA.

---

[4] In *Shaw v. Regents of the University of California*, 58 Cal. App. 4th 44, 48 (1997), in addition to holding that the Patent Policy was a part of the Patent Agreement, the appellate court also stated that: "The clear language of the patent agreement does not, as the University argues, effect a contemporaneous and "complete transfer of plaintiff's rights to the University." This language, however, is *dicta,* because the issue before the court was the interpretation of the Agreement as it affected the right of the University to change the royalty terms. This finding was not necessary to the court's decision. In any event, as noted above, to the extent it deals with the ownership of the intellectual property rights, it is wrong and not controlling.

8

## 3. CONCLUSION

Defendants' Motion to Dismiss for lack of standing should be granted. Moreover, Kunbargi's failure to notify the University or to acknowledge its ownership of the underlying intellectual property is further evidence of Kunbargi's bad faith and unclean hands, depriving him of the right to proceed.

DATED: November 12, 2010

RICHARD C. LEONARD
LEONARD, DICKER & SCHREIBER
Limited Liability Partnership

JAMES W. GERIAK
THOMAS J. GRAY
ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Richard C. Leonard
Attorneys for Defendants and
Counterclaimant

# DECLARATION OF RICHARD C. LEONARD

I, Richard C. Leonard, declare as follows:

1. I am an active member of the State Bar of California and am admitted to practice before this Court. Through my professional corporation, I am a partner in the law firm of Leonard, Dicker & Schreiber, Limited Liability Partnership, counsel for CTS Cement Manufacturing Corp., et al., (collectively "Defendants") in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. Attached hereto as Exhibit "7" is a true and correct copy of a portion of the Reporter's Transcript of Proceeding, dated June 24, 2008, at 84:19-85:8 in the state court litigation.

3. Attached hereto as Exhibit "8" is a true and correct copy of an Assignment from K A Group to Hassan Kunbargi that was produced by Plaintiffs in discovery in this action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 12th day of November 2010, at Beverly Hills, California.

_____
Richard C. Leonard

1130-22\P\reply re STANDING motion.doc

LEONARD,
DICKER &
SCHREIBER
Limited Liability
Partnership

10

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CENTRAL DISTRICT OF CALIFORNIA

ULTIMAX CEMENT MFG. CORP. AND )
HASSAN KUNBARGI, )
 )
        Plaintiffs, )
 )
     vs. ) No. BC353644
 )
CTS CEMENT MFG. CORP., et al., )
 )
        Defendants. )
                                      )

VOLUME II

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

Tuesday, June 24, 2008

Los Angeles, California

REPORTED BY:

KAREN E. KAY
CSR NO. 3862, RMR, CRR

JOB NO.
55760LEO/A

Page 2

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2               CENTRAL DISTRICT OF CALIFORNIA
 3
     ULTIMAX CEMENT MFG. CORP. AND      )
 4   HASSAN KUNBARGI,                   )
                                        )
 5                   Plaintiffs,        )
                                        )
 6           vs.                        ) No. BC353644
                                        )
 7   CTS CEMENT MFG. CORP.; EDWARD K.   )
     RICE; THE QUIKRETE COMPANIES, A    )
 8   DELAWARE CORPORATION; QUIKRETE     )
     INTERNATIONAL, INC., A DELAWARE    )
 9   CORPORATION; AND DOES 3-50,        )
                                        )
10                   Defendants.        )
                                        )
11   _____)
12
13           REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS,
14           Volume II, taken at 9:04 a.m. on Tuesday, June
15           24, 2008, at 707 Wilshire Boulevard,
16           Forty-Sixth Floor, Los Angeles, California,
17           before Karen E. Kay, CSR No. 3862, RMR, CRR, a
18           Certified Shorthand Reporter in and for the
19           County of Los Angeles, State of California.
20
21
22
23
24
25
```

```
 1   APPEARANCES:

 2   BEFORE:

 3            HON. JON M. MAYEDA
              Judge of the Superior Court (Ret.)
 4            707 Wilshire Boulevard
              Forty-Sixth Floor
 5            Los Angeles, California 90017
              213.620.1133
 6
     FOR THE PLAINTIFFS:
 7
              MIR SAIED KASHANI
 8            Attorney at Law
              800 West First Street
 9            Suite 400
              Los Angeles, California 90012
10            213.625.4320

11   FOR THE DEFENDANTS CTS MANUFACTURING CORP. AND EDWARD K.
     RICE:
12
              LEONARD, DICKER & SCHREIBER, L.L.P.
13            BY:  RICHARD C. LEONARD
                   Attorney at Law
14                    and
                   BRAD PARR
15                 Attorney at Law
              9430 Olympic Boulevard
16            Suite 400
              Beverly Hills, California 90212.4519
17            310.551.1987

18

19

20

21

22

23

24

25
```

```
 1   meet Mr. Rice?
 2       A   He didn't ask me to meet him.  I just enter his
 3   office, and I find him.  I was going to consult
 4   Dr. Knapp for something I have in the lab, and I find
 5   him there.  He introduced me to him.
 6       Q   Dr. Knapp passed away in 1986, correct?
 7       A   Yes.  Hit-and-run accident.
 8       Q   And did you do any work with Mr. Rice prior to
 9   Dr. Knapp's passing?
10       A   I think I start consulting for him sometime
11   around that time, yes.
12       Q   And what were you doing for Mr. Rice prior to
13   Dr. Knapp's passing?
14       A   I was testing shrinkage bars and testing cement
15   strength, you know, cubes and strength.
16       Q   Doing sort of basic laboratory work?
17       A   Yes.
18       Q   Now, Dr. Knapp passed away in 1986.
19           You needed to have a faculty advisor for your
20   graduate work, did you not?
21       A   I was a graduate already at that time.
22       Q   Didn't you still need to have a graduate
23   advisor to assist you?
24       A   Yes.
25       Q   And Mr. Rice was appointed as an adjunct
```

1    professor in the engineering department?

2       A    Never.

3       Q    "Never"?

4       A    No.

5       Q    You never worked under Mr. Rice at UCLA?

6       A    He lied. He never been an adjunct professor at
7    UCLA during my time. He tried and they tried to let him
8    in, and they rejected his credential. And at that time
9    they transfer me from Knapp to Chris Wagner,
10   W-a-g-n-e-r.

11            MR. LEONARD: Let me mark as our next in
12   order -- do you know what that's going to be?

13            MR. PARR: 558.

14            MR. LEONARD: It's a letter dated December 29,
15   1988 from Hassan Kunbargi to Edward Rice.

16            (Defendants' Exhibit 558 was marked for
17   identification.)

18            MR. KASHANI: Is that in your book?

19            MR. LEONARD: No, not yet. I'll pass that out.

20            MR. KASHANI: What's the date, please?

21            MR. LEONARD: December 29.

22            MR. KASHANI: I think I may be able to assist
23   you. Is this it?

24            THE WITNESS: Yes.

25            MR. KASHANI: Okay. It's up on the screen.

1      MR. LEONARD: I don't need it on the screen.
2      THE WITNESS: Hold on a second.
3  BY MR. LEONARD:
4      Q   This is a letter that you sent to Mr. Rice in
5  December of 1988, correct?
6      A   Yes. That's asking for my royalties.
7      Q   Excuse me?
8      A   Asking for my royalties.
9      Q   Right. And I want you to look at the bottom of
10 the first page, the last paragraph. It says,
11 "Dr. Knapp, my advisor at UCLA, passed away in the
12 beginning of 1986. I was without an advisor for my
13 graduate study at UCLA."
14     A   Yes.
15     Q   "I was lucky that the department of the
16 material science agreed to appoint you as an adjunct
17 professor so you could be my advisor."
18     A   Yes.
19     Q   Was that a true statement when you wrote it?
20     A   Yes. They agreed to appoint him, but they
21 didn't appoint him. They asked for his --
22     Q   Excuse me. There's no question pending, sir.
23     A   Okay.
24     Q   Now, in addition to this lab work that you did
25 for Mr. Rice, did you do some work on a product called

```
 1   Fibermesh?
 2       A    Yes.
 3       Q    And what was Fibermesh?
 4       A    Fibermesh was like a fiber company that
 5   produced bulletproof fiber, and they were adding it to
 6   Portland cement for strength and shrinkage.
 7       Q    And was Mr. Rice working with Fibermesh on
 8   their product?
 9       A    I think he was consulting for them, yes.
10       Q    And did he ask you to assist him in some
11   research that he was doing for Fibermesh?
12       A    Yes.
13       Q    And did you do that?
14       A    Yes.
15       Q    And at some point did you start doing work for
16   CTS on Mr. Rice's product -- Fibermesh wasn't Mr. Rice's
17   product?
18       A    No.
19       Q    Did you start doing work on Mr. Rice's product
20   at some point?
21       A    Yes.
22       Q    And what product was that?
23       A    I think it was Rapid Set.
24       Q    And what year was that?
25       A    1986, if I'm not mistaken.
```

ASSIGNMENT

This is to confirm that in return for consideration, the receipt and adequacy of which is acknowledged, effective January 20, 2003, KA GROUP assigned to Hassan Kunbargi individually all claims and rights to recover damages arising from or related to misappropriation or infringement of U.S. Patent No. 4,957,556 or any continuation or follow-on patents related thereto, including damages for KA GROUP's lost profits. KA GROUP also assigned to Kunbargi all claims and rights to recover damages involving misappropriation or infringement of KA GROUP's clinker/cement technology and patents or involving the marketing of clinker, cement or cement products that copy or infringe upon such technology or patents, including claims for unfair business practices and misappropriation of trade secrets (if any). The claims and rights assigned comprised all claims and damages incurred through the date of final judgment or settlement.

_____
For KA GROUP
Samir R. Kuzbari

PLAINTIFF'S EXHIBIT 461

EXHIBIT 8

18

# PROOF OF SERVICE

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 9430 Olympic Boulevard, Suite 400, Beverly Hills, California 90212-4519.

On November 12, 2010, I served the foregoing document described as **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING REGARDING U.S. PATENT NO. 4,957,556; DECLARATION OF RICHARD C. LEONARD** on the parties in this action by placing true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

Stradling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660

Farshad Farjami, Esq.
Farjami & Farjami
26522 La Alameda Avenue, Suite 360
Mission Viejo, CA 92691

Michael J. Fitzgerald, Esq.
Barnes Crosby Fitzgerald & Zeman LLP
18101 Von Karman Avenue, Suite 120
Irvine, CA 92612

Steven P. O'Neill, Esq.
Lemieux & O'Neill
4165 East Thousand Oaks Boulevard
Suite 350
Westlake Village, CA 91362

Thomas V. Rhodes, Esq.
Smith Gambrell & Russell
Promenade II
1230 Peachtree Street NE, Suite 3100
Atlanta, GA 30309-3592

I deposited each envelope in the mail at Beverly Hills, California. Each envelope was mailed with postage thereon fully prepaid.

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

By serving the above-described document, I certify that the original of said document was produced on paper purchased as recycled paper.

Executed on November 12, 2010, at Beverly Hills, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
PEGGY HARRINGTON

LEONARD,
DICKER &
SCHREIBER
Limited Liability
Partnership