# UNITED  STATES  DISTRICT  COURT

## FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | |
|---|---|
| ULTIMAX CEMENT MANUFACTURING CORP., et al., | CASE NO. SACV 02-578 AG (ANx) |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON SHOP RIGHT AND GRANTING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON LACHES AND ESTOPPEL |
| v. | |
| CTS CEMENT MANUFACTURING CORP. d/b/a CTS CEMENT MANUFACTURING CO., et al., | |
| Defendants. | |

After a four-week trial in this decade-old patent infringement case, the jury was unable to reach a verdict.  The Court discharged the jury, and the parties timely filed renewed motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  Defendants CTS Cement Manufacturing Corp., *et al.* (together, "Defendants") move for judgment as a matter of law on the issues of shop right, co-inventorship, and noninfringement.  ("Defendants' Rule 50 Motion").  Defendants also request judgment as a matter of law on the grounds of laches, equitable estoppel, and obviousness ("Defendants' Laches and Estoppel Motion" and "Defendants' Obviousness Motion").  Plaintiffs Ultimax Cement Manufacturing Corp. ("Ultimax"), Hassan Kunbargi, and KA Group (together, "Plaintiffs") move for judgment as a

1   matter of law on the issues of shop right, best mode, inventorship, and the quantity of infringing

2   cement sold by Defendants ("Plaintiffs' Rule 50 Motion").

3          After considering all arguments and papers submitted, the Court GRANTS Defendants'

4   Rule 50 Motion as to shop right.  The Court also GRANTS Defendants' Laches and Estoppel

5   Motion.  The parties' remaining Motions are DENIED as moot.

6

7   **BACKGROUND**

8

9          Ultimax and CTS Cement Manufacturing Corp. ("CTS") both produce rapid-hardening,

10  high-strength cement.  *See generally Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,

11  587 F.3d 1339 (Fed. Cir. 2009).  Hassan Kunbargi, the owner of Ultimax, and Edward K. Rice,

12  the owner of CTS, have a long history together.  In the mid-1980s, Kunbargi began

13  experimenting with cement chemistry as a graduate student at UCLA.  Rice became Kunbargi's

14  mentor and sought an adjunct faculty position at UCLA to serve as Kunbargi's advisor.

15         Kunbargi began working for Rice in 1985 and started working for CTS no later than

16  1987.  In the summer of 1988, while working for Rice and CTS at the Riverside Cement

17  Company, Kunbargi participated in experiments involving rapid-hardening, high-strength

18  cement.  Later in 1988, while working on a project for Rice and CTS at the Heartland Cement

19  Sales Company cement plant in Independence, Kansas, Kunbargi participated in a burn

20  experiment (known as "Burn One" or the "Heartland Burn") which resulted in the production of

21  a novel form of rapid-hardening, high-strength cement.

22         Kunbargi stopped working on Rice's projects in early 1989, and in September 1990,

23  Kunbargi received U.S. Patent 4,957,556 patent ("'556 patent") titled "Very Early Setting High

24  Strength Early Cement."  Ultimax now owns the '556 patent.

25         Twelve years after receiving the '556 patent, Plaintiffs sued Defendants for

26  misappropriation of trade secrets, various business torts, infringement of claims 9-11 of the '556

27  patent, and infringement of various claims of U.S. Patents 6,113,684 and 6,406,534.  In 2004,

28  the previous district court granted Defendants' motion for summary judgment as to claim 9 of

the '556 patent after finding that CTS did not infringe claim 9 and that the '556 patent was unenforceable due to laches. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp*, 2004 U.S. Dist. LEXIS 29580 (C.D. Cal. Dec. 6, 2004) (Stotler, J.). In 2009, the Federal Circuit reversed the district court's summary judgment based on a revised construction of the claim terms and a finding that genuine issues of material fact existed as to Defendants' laches defense. *Ultimax*, 587 F.3d at 1339. The case was transferred to this Court in mid-2011. When the case went to trial in September 2011, the only claim remaining was for infringement of claim 9 of the '556 patent.

As noted, the month-long trial in this case ended without a verdict. The jurors' task was very difficult. They were asked to absorb and apply significant amounts of complex evidence, without the background and contextual understanding often taken for granted by experts in the subject matter. Counsel for both sides also struggled to frame important issues and put the voluminous evidence – including weeks of highly technical testimony and more than 150 evidentiary exhibits – in context.

**PRELIMINARY MATTERS**

Because of delays related to production of the trial transcript, the parties' Rule 50 Motions, though timely, lacked verifiable citations to the trial record. (See Rule 50 Motions, Oppositions, Replies, Objections, Dkt. Nos. 1550-1557, 1563, 1564, 1567.) Both parties acknowledged the difficulties this posed. In their Rule 50 Motion, for example, Defendants admitted the "possib[ility] that without the benefit of a transcript, both Plaintiffs and Defendants have made claims about evidence that may not have been as they remembered it." (Dkt. No. 1564 at 2:1-3). Plaintiffs expressly requested that consideration of Defendants' Rule 50 Motion "be deferred until it can be compared to the actual trial transcript . . . ." (Dkt. No. 1555 at 1:23-24.)

Although there were sufficient grounds to grant Defendants' Rule 50 Motion and Defendants' Laches and Estoppel Motion based on the papers originally filed, the Court

1    permitted the parties to supplement their Motions with references to the trial record.  (See Dkt.

2    Nos. 1575, 1610-1615.)  The addition of excerpts from the trial record proved useful.  While

3    Defendants' recollection of the record was less than perfect, many of Plaintiffs' characterizations

4    of the record were misleading or simply false.  For example, Plaintiffs stated in their objections

5    to Defendants' Rule 50 Motions that "there was no record testimony that the cement produced at

6    Heartland in 1988 made 3000 [pounds per square inch] in one hour . . . ."  (Dkt. 1567 at 3:1-3.)

7    A review of the trial transcript reveals just the opposite.  Indeed, in deposition testimony read

8    into the record by defense counsel, *Plaintiff Kunbargi* admitted that the Heartland cement

9    reached a strength of 3000 PSI. (*See* Tr. Sept. 16, 2011, Dkt. No. 1584, Part 3, at 48:14-23.)

10       Plaintiffs also state that there is "[n]o record evidence Kunbargi was consulting 'for

11   Rice.'"  (Dkt. 1567 at 8:19-21.)  Nonsense.  The record contains numerous references to

12   Kunbargi's work as a consultant for Rice.  In a 1988 letter to Rice, for example, *Kunbargi* wrote

13   that in 1985, "I was consulting for you on different projects."  (Ex. 558.)  When asked at trial

14   whether he was "an employee of Mr. Rice or a consultant," Kunbargi simply responded, "[a]

15   consultant."  (Tr. Sept., 21, 2011, Dkt. No. 1565, at 18:3-5; *see also* references at Dkt. No. 1612

16   at 9:20-12:28.)

17       Finally, the Court notes that Plaintiffs' Rule 50 Motion opens not with an argument

18   concerning the merits of the case, but instead with an attack on defense counsel's motives in

19   questioning Kunbargi.  Plaintiffs state that

20           Defendant's counsel spent considerable time at trial reminding the

21           jury of Mr. Kunbargi's national origin (such as cracks about "some

22           university in Syria"), going out of his way to tell that jury that Mr.

23           Kunbargi's brother is named Abdul and that he once considered

24           importing goods from Syria, deliberately confusing Mr. Kunbargi

25           with his attorney Kashani, and other character assassination . . . .

26           But counsel forgot to, or was unable to make the basic outline of his

27           case on shop right.

28

4

1   (Dkt. 1552 at 1:5-13.)  This theme appears throughout Plaintiffs' papers.  For example, Plaintiffs

2   contend that "Defendants presented no evidence tying any defendant in this case to Kunbargi's

3   employer in 1988" because "Defendants were too busy insulting Mr. Kunbargi's heritage."

4   (Dkt. 1552 at 4:2-5; *see also* Dkt. No. 1613 at 10:11-12.)

5        The Court takes accusations of this sort extremely seriously and refuses to tolerate

6   invidious racial tactics.  But in this case, there is nothing to support Plaintiffs' allegation that

7   defense counsel attempted to improperly influence the jury, much less through references to

8   Kunbargi's heritage, national origin, or ethnicity.  In any event, the Court puts this disturbing

9   and distracting claim to the side, and turns instead to the merits of the parties' Motions.

10

11   **LEGAL STANDARD**

12

13        Under Federal Rule of Civil Procedure 50(b), a party may renew a motion for judgment as

14   a matter of law after the jury returns a verdict, or after the jury, having been unable to reach a

15   verdict, is discharged.  Fed. R. Civ. P. 50(b).  The standard here, after a mistrial, is certainly no

16   stricter than after a jury verdict.  Judgment as a matter of law may be granted only when the

17   evidence and its inferences, construed in the light most favorable to the nonmoving party,

18   permits only one reasonable conclusion as to the verdict.  *See Theme Promotions, Inc. v. News

19   Am. Mktg. FSI*, 546 F.3d 991, 999 (9th Cir. 2008); *see also Johnson v. Paradise Valley Unified

20   Sch. Dist.*, 251 F.3d 1222, 1226-27 (9th Cir. 2001), *cert. denied*, 534 U.S. 1055, (2001).

21        "A jury's verdict must be upheld if it is supported by 'substantial evidence.'"  *See SEC v.

22   Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing *Maynard v. City of San Jose*, 37 F.3d 1396,

23   1404 (9th Cir. 1994)).  "Substantial evidence is evidence adequate to support the jury's

24   conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."

25   *Todd*, 642 F.3d at 1215 (quoting *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)

26   and *Paradise Valley*, 251 F.3d at 1227).  In making this determination, "[t]he court must not

27   weigh the evidence, but rather should ask whether [the nonmoving party] has presented

28   sufficient evidence to support the jury's conclusion."  *Todd*, 642 F.3d at 1215 (citing *Paradise

1   *Valley*, 251 F.3d at 1227-28).  The court must disregard all evidence favorable to the moving

2   party that the jury is not required to believe.  *See Wallace v. City of San Diego*, 479 F.3d at 624.

3   Further, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and

4   all reasonable inferences must be drawn in favor of that party." *Todd*, 642 F.3d at 1215.

5   "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only

6   one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Wallace*, 479

7   F.3d at 624 (citing *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir.2000)).

8

9   <u>**ANALYSIS**</u>

10

11       Judgment must be granted for Defendants on two independent bases.  First, when all the

12   evidence is considered and all inferences are drawn in Plaintiffs' favor, the only reasonable

13   conclusion the evidence permits is that Rice and CTS have a shop right in the '556 patent.

14   Second, Plaintiffs' infringement claim as to claim 9 of the '556 patent is barred by the doctrines

15   of laches and equitable estoppel.  The Court first discusses the defense of shop right before

16   turning to the defenses of laches and estoppel.

17

18   **1.**     **RICE AND CTS HAVE SHOP RIGHTS IN THE '556 PATENT**

19

20       "A 'shop right' is generally accepted as being a right that is created at common law, when

21   the circumstances demand it, under principles of equity and fairness, entitling an employer to use

22   without charge an invention patented by one or more of its employees without liability for

23   infringement." *McElmurry v. Arkansas Power & Light*, 995 F.2d 1576, 1580 (Fed. Cir. 1993)

24   (citing D. Chisum, *Patents*, § 22.02[3] (1985 rev.)); *see also Teets v. Chromalloy Gas Turbine*

25   *Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996) ("[T]he law recognizes that employers may have an

26   interest in the creative products of their employees."); *see also United States v. Dubilier*

27   *Condenser Corp.*, 289 U.S. 178, 188-89 (1933) ("Since the servant uses his master's time,

28   facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which

embodies his own property . . . .").  Guided by these equitable principles, the Federal Circuit has held that "an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention."  *Teets*, 83 F.3d at 407.

A strong argument can be made that questions concerning shop right – which, after all,  is "a type of implied license," *McElmurry*, 995 F.2d at 1581 – should be decided by courts, not juries.  *See Glass Equipment Development, Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir. 1999) (citing *Met-Coil Sys. v. Korners Unlimited, Inc.*, 803 F.2d 684 (Fed. Cir. 1986) (holding that "[t]he existence of an implied license to use a patent is a question of law"); see also *Cornell Univ. v. Hewlett-Packard*, 609 F. Supp. 2d 279 (W.D.N.Y. 2009) (Rader, J.) ("The existence of an implied license is a question of law reserved for the court.").

Indeed, the Ninth Circuit has expressly held that the determination of a shop right is a question of law.  *See Francklyn v. Guilford Packing Co.*, 695 F.2d 1158, 1160 (9th Cir. 1983) (holding that "[t]he district court's finding of shop right, as a question of law, is subject to our independent review"); *see also Rentrop v. Spectranetics Corp.*, 514 F. Supp. 2d 511, 517 (S.D.N.Y. 2007), *aff'd*, 550 F.3d 1112, 1117 (Fed. Cir. 2008) (declining to submit equitable defenses, including shop right, to the jury, while "recognizing the court's power do so . . . on an *advisory* basis") (emphasis added).

Further, there may be advantages to submitting the sometimes complex issues of shop right to the equitable determinations of the court, not the jury.

But the Court need not decide whether shop right determinations should be reserved to courts because, in this case, the only reasonable conclusion the evidence permits is that Rice and CTS hold a shop right in the '556 patent.  The Court reaches this conclusion viewing the record in the light most favorable to Plaintiffs, with all inferences drawn in their favor.  *See Wallace*, 479 F.3d at 624 (citing *McLean v. Ruyon*, 222 F.3d 1150, 1153 (9th Cir. 2003).  The Court also arrives at this conclusion without weighing the evidence submitted by the parties or making any determinations of credibility.

Plaintiffs' argument that no shop right exists in the '556 patent fails in part because Plaintiffs interpret the shop right doctrine too narrowly.  Plaintiffs argue that "shop right requires

1  *acquiescence* by the employee in the employer's use of the invention." (Dkt. 1615 at 3:5-6

2  (emphasis in original).)  And because Plaintiffs claim that there is evidence that Kunbargi did

3  not acquiesce to Defendants' use of the '556 patent, Plaintiffs conclude that Defendants' have no

4  shop rights in it.  But acquiescence by the patentee is not a precondition of the shop right

5  doctrine.  As the Federal Circuit explained in *McElmurry*,

6  > An employer will have shop rights in an invention in situations

7  > where the employer has financed an employee's invention by

8  > providing wages, materials, tools and a work place. *Other factors*

9  > creating shop rights *include* an employee's consent, *acquiescence*,

10  > inducement, or assistance to the employer in using the invention

11  > without demanding compensation.

12  *McElmurry*, 995 F.2d at 1582 (emphasis added).   While "acquiescence" is a factor that may be

13  considered under the "totality of the circumstances," its absence does not preclude the existence

14  of a shop right.  *Id.*  The reality is that "an employer may obtain a shop right in employee

15  inventions where it has contributed to the development of the invention." *Teets*, 83 F.3d at 407.

16  A contrary rule would enable employees to prevent employers from acquiring shop rights simply

17  by refusing to consent to the employers' use of inventions created with the employers' resources.

18      Judgment as a matter of law for Defendants on the issue of shop right is supported by the

19  record, which conclusively establishes that Kunbargi was hired to invent rapid-hardening high-

20  strength hydraulic cement.  The record compels the conclusion that Rice and CTS hold shop

21  rights in the '556 patent because all of the elements of claim 9 of the '556 patent were first

22  reduced to practice at Burn One using resources provided by Rice and his entities.  While it is

23  not necessary to support these conclusions with specific citations to the trial record, such

24  references help explain why the only reasonable conclusion the evidence permits is that Rice and

25  CTS have a shop right in the '556 patent.

26

27

28

### 1.1    Kunbargi Was Hired to Invent Hydraulic Cements

The record conclusively establishes that Kunbargi was hired to invent hydraulic cements like the one described in the '556 patent.  Exhibit 6094 is a classified advertisement, published by Rice in October 1986, describing the duties ultimately assigned to Kunbargi.

> MATERIALS SCIENCE ENGINEER:  Develop new hydraulic cements.  Design/develop/test equip.  Conduct lab/field investigations.  Plan experiments re: mfg. methodology, commercial prod. . . .

Further, *Kunbargi* himself testified that the hydraulic cement Rice hired him to develop is the subject of the '556 Patent.  When asked by defense counsel whether "develop[ing] new hydraulic cements . . . was one of [his] jobs with Mr. Rice," Kunbargi responded, "Yes."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 2, at 49:5-8.)  Immediately afterward, defense counsel asked Kunbargi whether "the cement which is the subject of the '556 Patent is a hydraulic cement."  (*Id.* at 49:9-10.)  Kunbargi responded that "[i]t is a hydraulic cement, yes."  (*Id.* at 49:11.)

Kunbargi's 1988 and 1989 letters to Rice further establish that he was hired to develop rapid-setting cement.  (Exs. 558, 565.)  In his December 29, 1988 letter to Rice, for example, Kunbargi writes that "I have been appointed as the man in charge at Heartland cement to produce the new cement and to supervise the quality control of the cement."  (Ex. 558.)  In the same letter, Kunbargi predicted that "the new Rapid Set cement is going to be the cement of the future, and the new processing technology is going to be the technology of the future."  (*Id.*)

### 1.2    Every Element of Claim 9 of the '556 Patent was Present at Burn One

The record conclusively establishes that every aspect of claim 9 of the '556 patent was present at Burn One in 1988.  Claim 9 of the '556 patent teaches

> A very early setting, ultra high strength cement consisting essentially of 10% to 30% by weight $C_4A_3S$, 5% to 25% by weight soluble

1           CaSO$_4$ anhydride and 45% to 85% by weight hydraulic cement and

2           having a compressive strength on the order of 3000 psi within

3           approximately one hour following hydration.

4 *Ultimax*, 587 F.3d at 1339 (citing '556 patent col.12 ll.5-10).  The specification redefines

5 common chemical symbols by, for example, stating that "C" represents CaO, "A" represents

6 Al$_2$O$_3$, and "S" represents SO$_3$.  *See id.*

7       Plaintiffs argue that every element of claim 9 was not present at Burn One.  (*See, e.g.*,

8 Dkt. 1555 at 3:2-5 (stating that "[t]here was no record evidence showing Kunbargi formed a

9 cement that achieved 3000 psi in one hour at Heartland in 1988, which is one of the patent

10 elements.").)  The Court could go through the voluminous evidence establishing that all elements

11 of claim 9 were present at Burn One.  But the Court need not do so because *Plaintiff Kunbargi*

12 testified as follows.

13          Q.     [Defense Counsel] All the elements in Claim 9 were at hand

14                  at Burn 1, weren't they?

15          A.     [Kunbargi] Yes.

16 (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 4, at 48:1-3.)

### 1.3    Kunbargi First Achieved His Invention at Burn One

20       Plaintiffs argue that even if all the elements of claim 9 were present at Burn One, the shop

21 right defense still must fail because Defendants did "not prove[] . . . that 1988 was the *first* time

22 *all* the elements of the invention were utilized."  (Dkt. 1615 at 7:25-27 (emphasis in original).)

23 In his November 2011 objections to Defendants' Shop Right Motion, Plaintiffs specifically

24 stated that "[t]here was no record evidence Kunbargi formed a cement that achieved 3000 psi in

25 one hour at Heartland in 1988."  (Dkt. 1555 at 3:2-4.)  With all inferences drawn in Plaintiffs'

26 favor, the trial record, including Kunbargi's testimony, establishes just the opposite.  The

27 following deposition testimony from Kunbargi, introduced at trial, is illustrative.

28

| | | |
|---|---|---|
| 1 | Q: | [Defense Counsel] . . . when was the first time that you |
| 2 | | observed ultra high-strength early setting cement having a |
| 3 | | compressive strength on the order of 3000 PSI within one |
| 4 | | hour? |
| 5 | A: | [Kunbargi] I think when I apply my formula to the production |
| 6 | | in the Heartland 1988, when I make that demonstration to Ed |
| 7 | | Rice. |
| 8 | Q: | That was the first time you'd observed that; okay? |
| 9 | A: | If I remember correct, yes. Yes. |

10   (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 3, at 48:14-23.)  Indeed, Kunbargi stated that the

11   compressive strength described in the '556 Patent "was *previously unobtainable* before I apply

12   my formula to produce the cement in Heartland."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 4, at

13   1:25-2:2 (emphasis added).)

14       Kunbargi wrote in his January 9, 1989 letter to Rice that the "Riverside burn" which took

15   place before Burn One, "did not meet our strength requirements."  (Ex. 588 at 2.)  He then adds

16   that "a very important discovery during the design of [Burn One] . . . explains what went wrong

17   in the Riverside Burn . . . ."  (*Id.* at 3.)   In the same letter, Kunbargi states that "I found the

18   solution, which was the new Rapid Set *while I was at Heartland*."  (*Id.* (emphasis added).)

19   These admissions *by Kunbargi* preclude the need to address any argument that he invented,

20   perfected, or reduced to practice claim 9 of the '556 patent before Burn One.

21

22       **1.4     Burn One Was Financed By Rice and His Entities**

23

24       The record also conclusively establishes that Rice provided the financing and resources

25   necessary to conduct Burn One at Heartland in 1988.  *See McElmurry*, 995 F.2d at 1582 ("An

26   employer will have shop rights in an invention in situations where the employer has financed an

27   employee's invention by providing wages, materials, tools and a work place."); *see also Teets*,

28

1    83 F.3d at 407 ("[A]n employer may obtain a shop right in employee inventions where it has

2    contributed to the development of the invention.").

3         Kunbargi testified, for example, that Rice paid "all costs for the Heartland burn,"

4    including travel expenses, rental fees for the Burn One facility in Kansas, "all the equipment

5    used at the burn," and materials used in the burn, among other things. (Tr. Sept. 16, 2011, Dkt.

6    No. 1584, Part 3, at 29:8-30:12.)

7

8         **1.5     Kunbargi Was Working For Rice and Rice's Entities, Including CTS, in 1988**

9

10        Plaintiffs argue in their Rule 50 Motion that judgment as a matter of law should be

11   granted in their favor because "[t]here is certainly no evidence that defendant CTS Cement

12   Manufacturing Corp., a corporation, or defendant Rice, employed Kunbargi in 1988." (Dkt.

13   1552: at 1:24-26.)  In their Opposition to Defendants' Supplementary Rule 50 Motion –

14   submitted *after* the parties received copies of the trial transcript – Plaintiffs revised their

15   argument.  Instead of arguing that CTS and Rice did not employ Kunbargi in 1988, Plaintiffs

16   concede that Kunbargi "was working for Ed Rice at some point and was paid by a company," but

17   claim that "[w]hich company, or when remains unclear." (Dkt. 1613 at 3:12-15.)

18        Plaintiffs' argument fails because the record conclusively establishes that Kunbargi was

19   working for Rice and his entities, including CTS, in 1988.  Conversely, there is no evidence –

20   much less "sufficient evidence" or "substantial evidence" – to support a reasonable finding that

21   Kunbargi did *not* work for Rice or CTS in 1988. *See Wallace*, 479 F.3d at 624 (citing *Paradise

22   Valley*, 251 F.3d at 1226-27).  As before, the Court arrives at this conclusion without weighing

23   the parties' evidence.

24        Evidence introduced during Plaintiffs' case-in-chief and Defendants' case-in-chief

25   independently compel the conclusion that Kunbargi worked for Rice and his entities, including

26   CTS, in 1988.  Additional support for this conclusion comes from admissions made by

27   *Plaintiffs' counsel* throughout the trial, including during opening statements.

28

In a letter from Kunbargi to Rice dated December 29, 1998, Kunbargi admits that
"[d]uring that time period [1985] I was consulting for you [*Rice*] on different projects . . . ."
(Ex. 558, p. 1).  In the same letter, *Kunbargi* writes that "I started consulting for *CTS* and I was
appointed as a project manager at the end of 1987, when I started to get involved in the
production of old Rapid Set cement, as a next step of R&D . . . ."  (Ex. 558 at 2 (emphasis
added).)

In a second letter from Kunbargi to Rice, dated January 9, 1989, Kunbargi confirms that
his employment extended through December 1988.  *Kunbargi* specifically states that "[f]or my
consulting for you during the last burn[, Burn One], *from June 1988, to December 1988*, I have
been under the impression that I was going too [sic] have a share of the profits now that burn is
completed, based on our conversations and your promises during that period . . . ."  (Ex. 565
(emphasis added).)

In Plaintiffs' September 2001 business plan – written before this lawsuit was filed –
Kunbargi states that he served as a "partner/production manager at CTS Cement Company,
where he led growth of the first production of rapid hardening cement technology in the nation."
(Ex. 4406, Appx. I.)

When asked by defense counsel at trial when he started working for Rice, *Kunbargi*
answered "[s]ometime in the summer of 1985."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 2, at
23:2-3.)  When asked moments later if he worked for Rice's company, Rapid Set, Kunbargi
responded "you see Rice and Rapid Set and Chem-Comp, they are the one, the same.  I get paid
from different entities, so I don't know if – which one I was consulting to.  All what I know is I
was consulting to Mr. Rice."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 2, at 23:8-11.)  Kunbargi
later testified that "[a]s far as I know they are the same on one, Rice, Ritech, CTS, Rapid Set,
Chem-Comp.  At that time I was working for Ed Rice."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part
3, at 18:24-19:1.)

Throughout the trial, defense counsel repeatedly questioned Kunbargi about his work for
CTS.  The following exchanges during defense counsel's cross-examination of Kunbargi on
September 21, 2011 are illustrative.

1       Q:    [Defense Counsel] And as of January 9[, 1989,] you were no

2              longer officially working for CTS; correct?

3       A:    [Kunbargi] I think as of January – end of January . . . I

4              stopped consulting for CTS or Ed Rice.

5              . . .

6       Q:    Before you left your position with CTS, you asked Mr. Rice

7              to provide you with a – a job reference, didn't you?

8       A:    I think so, yes.

9              . . .

10      Q:    Did you understand the work you did for CTS was

11             confidential?

12      A:    Supposed to be, yes.

13  (Tr. Sept. 20, 2011, Dkt. No. 1583, Part 1, at 8:23-9:3, 13:4-7, 22:1-3.)

14      In his opening statement, *Plaintiffs' counsel* admitted the following

15         It is true that years and years ago Mr. Kunbargi was *working as a*

16         *consultant for Mr. Rice and CTS Cement*, but the evidence will also

17         show that Mr. Kunbargi invented this invention before he ever

18         worked for Mr. Rice.

19  (Tr. Sept. 13, 2011, Dkt. No. 1586, Part 4, at 6:18-21.)  "The binding effect on a party of a clear

20  and unambiguous admission of fact made by his or her attorney in an opening statement was

21  acknowledged by the Supreme Court in *Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880), and

22  has been frequently recognized in subsequent lower court decisions involving civil cases."

23  *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984); *see also U.S. v. Carleson*, 103 F.3d

24  141 (9th Cir. 1996) ("Statements made by an attorney concerning a matter within his

25  employment may be admissible against the party retaining the attorney.") (quoting *McKeon*, 738

26  F.2d at 30); *see also United States v. Hurwitz*, 459 F.3d 463, 481 (4th Cir. 2006) ("[A] clear and

27  unambiguous admission of fact made by a party's attorney in an opening statement in a civil or

28

1   criminal case is binding upon the party.") (citing *U.S. v. Blood*, 806 F.2s 1218, 1221 (4th Cir.

2   1986).

3          The record, including the following testimony from Kunbargi, establishes that he received

4   payments from Rice and companies Rice owned.

5          Q:      [Defense Counsel] And – well you testified you received

6                  payment, though, sometimes from various of Mr. Rice's

7                  affiliated companies; correct?

8          A:      [Kunbargi] As far as I know it's his company 100 percent.

9                  He has no – he has no partners, no corporation.  He – okay. I

10                 got being paid by a company name, a check, but the work was

11                 for Ed Rice.

12         Q:      The work was requested by Mr. Rice for his Company;

13                 correct?

14         A:      I was working for Ed Rice.

15   (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 2, at 39:3-13.)

16         Plaintiffs' odd, piecemeal objections to the trial record excerpts in Defendants' Rule 50

17   Motion grasp at straws and further confirm that the only reasonable conclusion supported by the

18   evidence is that Kunbargi worked for Rice and his entities, including CTS, in 1988.  *See*

19   *Wallace*, 479 F.3d at 624.  For example, Plaintiffs argue that evidence establishing that Kunbargi

20   worked for Rice and CTS in 1987 shows that Kunbargi did not work for Rice or CTS in 1988.

21   (Dkt. 1615 at 17:14-26.)  But when confronted with evidence showing that Kunbargi did indeed

22   work for Rice and CTS in 1988 (*see, e.g.*, Dkt. 1615 at 18:1-4), Plaintiffs ignore the date

23   altogether and instead focus on the identity of the employer.

24         Further, when confronted with specific evidence showing that Kunbargi worked for CTS

25   in 1988 (s*ee, e.g.*, Exs. 558, 565), Plaintiffs claim the reference to "CTS" is ambiguous.

26   Plaintiffs specifically claim that CTS "could, for example, refer to 'Chem Tech Services

27   Company', an Illinois corporation referenced in Exhibit 484."  (Dkt. No. 1613 at 9:14-17.)   This

28   argument is frivolous.  CTS Cement Manufacturing Corporation, also known as "CTS," is the

first Defendant named in Plaintiffs' June 2002 Complaint.  At the beginning of the trial, the
Court stated that "[t]he defendants consist of CTS Cement Manufacturing Corporation –
sometimes called 'CTS.'"  (Tr. Sept. 13, 2011, Dkt. No. 1586, Part 1, at 24:10-11.)  And
throughout the trial, both counsel and numerous witnesses repeatedly referred to CTS Cement
Manufacturing Corporation simply as CTS.  Because the examples are too numerous to catalog,
the Court discusses just a few.

In his opening statement, Plaintiffs' counsel stated that "[t]he defendants in this case, the
other side, consists of a company called CTS Cement Manufacturing Corporation, some
companies related to *CTS* that have more or less the same name, Rapid Set, which is the brand
name for *CTS* cement."  (Tr. Sept. 13, 2011, Dkt. No. 1586, Part 3, at 24:5-9 (emphasis added).)
Plaintiffs' counsel then proceeded to refer to "CTS" dozens of times in his opening statement,
without using its full name.  And during his initial questioning of Kunbargi – the first witness at
trial – Plaintiffs' counsel referred to Defendants not by its full name, but rather by the acronym
"CTS."  (Tr. Sept. 14, 2011, Dkt. No. 1585, Part 4, at 21:25 (Q: [Plaintiffs' counsel] "Are you
familiar with how CTS makes cement?").)  Kunbargi also consistently referred to CTS Cement
Manufacturing Corporation simply as "CTS."  For Plaintiffs to now suggest that CTS "could . . .
refer to 'Chem Tech Services Company,'" (Dkt. No. 1613 at 9:14-17), is to condemn Plaintiffs'
overall argument with faint support.

Plaintiffs next argue that "CTS Cement Mfg. Corp. did not exist in 1988."  (Dkt. 1615 at
14:24-25; *see also* Dkt. 1613 at 8:9-10 ("CTS Cement Mfg. Corp. . . . did not exist in 1988."; *see
also* Dkt. 1552 at 1:26 ("There is no evidence that CTS even existed in 1988.").)  This argument
borders on frivolous.  Tellingly, Plaintiffs provide no supporting excerpts from the trial record.
The Court need not rely on CTS's certificate of incorporation – which was issued by the
California Department of State in *1987* – to show that CTS existed in 1988 because Plaintiffs'
own evidence establishes CTS's existence at that time.  In his January 1989 letter to Rice, for
example, Kunbargi admits that "[he] started consulting for CTS and . . . was appointed as a
project manager at the end of 1987."  (Ex. 558 at 2.)

1    Even if the Court were to disregard the record and assume that certain jurors concluded

2    that Kunbargi was not working for CTS in 1988, judgment as a matter of law for Defendants

3    would still be appropriate because any shop rights in the '556 Patent held by Rice, or one of his

4    companies, would have passed to CTS, a company Rice wholly owned.  Kunbargi's purported

5    inability to distinguish between Rice, CTS, and Rice's other entities does not change this fact.

6    (*See, e.g.*, Tr. Sept. 16, 2011, Dkt. No. 1584, Part 1, at 38:23-25 (A [Kunbargi]: "That's their –

7    their cement, CTS cement, Ed Rice cement."); *see also* Tr. Sept. 16, 2011, Dkt. No. 1584, Part 3,

8    at 18:24 (A: [Kunbargi] "As far as I know they are the same on one, Rice, Ritech, CTS, Rapid

9    Set, Chem-Comp.").)

10    While shop rights are personal and cannot be assigned or transferred, *see, e.g., Hapgood*

11    *v. Hewitt*, 119 U.S. 226 (1886), a shop right can pass to others under certain circumstances.  *See*

12    *California Eastern Laboratories*, 896 F.2d 400, 400-02 (9th Cir. 1990); *see also Lane & Bodley*

13    *Co. v. Locke*, 150 U.S. 193 (1893) (distinguishing *Hapgood*).  The record establishes that Rice

14    possessed a shop right in the '556 patent and that Rice was the owner of CTS and the other

15    relevant companies in 1988.  For example, Kunbargi testified "As far as I know, [the company

16    that paid Kunbargi in 1988] is [Rice's] company 100 percent.  He has – he has no partners, no

17    corporation."  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 2, at 39:6-7; *see also* Tr. Sept. 23, 2011,

18    Dkt. No. 1569, at 128:7-15.)

19    In *California Eastern Laboratories*, the Ninth Circuit held that it would violate the

20    principles of equity underlying the shop right doctrine to deny a shop right to a successor

21    corporation that acquired the entire business of the original holder of the shop right.  896 F.2d at

22    402 (finding that a shop right passed from seller to buyer even though the buyer "distributed the

23    [seller's] assets to various existing subsidiaries").  The Court specifically held that attempts to

24    invalidate shop rights based on the "*formalities of modern business organization*" were

25    "unsuitable to the equitable origins of the shop right concept."  *Id.* (emphasis added) (citing

26    *Gate-Way, Inc. v. Hillgren*, 82 F. Supp. 546, 555 (C.D. Cal. 1949), *aff'd per curiam*, 181 F.2d

27    1010 (9th Cir. 1950) ("Unassignable licences may sometimes be invoked by persons who are not

28    exactly identical with the licensees.") (quoting 1 *Walker on Patents*, 437 (6th ed.)).

1    Plaintiffs' argument that CTS could not have held a shop right in the '556 patent because

2    the shop right was held by Rice himself or entities owned or controlled by Rice elevates the

3    "formalities of modern business organization" over the "equitable origins of the shop right

4    concept." *See California Eastern Laboratories*, 896 F.2d 400, 402 (9th Cir. 1989). (*See, e.g.*,

5    Dkt. No. 1613 at 1:11-12 (where Plaintiffs argue "references to different employers at different

6    times" precludes a finding that CTS held a shop right in the '556 patent).)

7    The holding of *California Eastern Laboratories* is far from novel.  In *Lane & Bodley Co.

8    v. Locke*, 150 U.S. 193, 196 (1893), a seminal case interpreting the shop right doctrine, the

9    Supreme Court expressly permitted the use of a shop right by a successor.  The Court stated that

10    In the present case it clearly appears that the [successor corporation,

11    Lane & Bodley Company] was organized upon the same basis as the

12    [original] firm [of Lane and Bodley]; that the business of the

13    company was to be the same as that carried on by Lane & Bodley,

14    and to be carried on on the same premises; that the entire property

15    and assets of the [original] firm and its liabilities and obligations

16    were devolved upon the [successor] company.

17    Plaintiffs also briefly argue that CTS is not entitled to a shop right because Defendants

18    failed to established that "[Kunbargi] had an employer as opposed to an independent contractor

19    relationship[] in 1998." (Dkt. 1613 at 1:4-5.)  This argument fails because the shop right

20    analysis does not hinge on whether Kunbargi was an employee, an independent contractor, or a

21    consultant.  As the Ninth Circuit stated in *Francklyn v. Guilford Packaging Co.*, 695 F.2d 1158,

22    1160-61 (9th Cir. 1983),

23    while a shop right generally arises out of an employer-employee

24    relationship, it is not necessarily limited to such a relationship.

25    [Citations omitted.]  The full nature of the parties' relationship must

26    be examined to determine whether a shop right exists, not merely

27    whether that relationship is characterized as an employment or as an

28    independent contractual arrangement.

18

### 1.6 Conclusion

"To promote the Progress of Science and useful Arts," the Constitution of the United States authorizes Congress to pass laws "securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]" U.S. Const. art. I, § 8, cl. 8. "There is virtually unanimous agreement that the purpose of the patent system is to promote innovation by granting exclusive rights to encourage invention." Dan L. Burk & Mark A. Lemley, *The Patent Crisis and How the Courts Can Solve It*, at 37 (2009). The doctrine of shop right does not diminish the incentive to innovate, but instead extends it to those who make innovation possible in the first place "by providing wages, materials, tools and a work place." *McElmurry*, 995 F.2d at 1582.

The innovations in cement technology that Plaintiffs claim to have pioneered would not have been possible without the capital and resources that Defendants provided. When all the evidence is viewed in the light most favorable to Plaintiffs, and all inferences and credibility determinations are drawn in Plaintiffs' favor, the only reasonable conclusion the evidence permits is that Rice and CTS held a shop right in the '556 patent.

The Court GRANTS Defendants' Rule 50 Motion.

## 2. LACHES AND EQUITABLE ESTOPPEL

The Federal Circuit defines laches to mean "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc) ("Courts of equity, it has often been said, will not assist one who has slept on his rights, and shows no excuse for his laches in asserting them.") (quoting *Lane & Bodley*, 150 U.S. at 201). The doctrine of laches

> assures that old grievances will some day be laid to rest, that
> litigation will be decided on the basis of evidence that remains

1                 reasonably accessible and that those against who claims are

2                 presented will not be unduly prejudiced by delay in asserting them.

3                 Inevitably it means that some potentially meritorious demands will

4                 not be entertained.  But there is justice too in an end to conflict and

5                 in the quiet of peace.

6 *A.C. Aukerman*, 960 F.2d at 1029 (quoting *Environmental Defense Fund v. Alexander*, 614 F.2d

7 474, 481 (5th Cir. 1980)).

8        To establish laches in an infringement context, an alleged infringer must prove (1) that

9 the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time

10 the patentee knew or *reasonably should have known* of his or her claim against the alleged

11 infringer, and (2) that the delay prejudiced or injured the alleged infringer.  *See Ultimax*, 587

12 F.3d at 1349 (citing *A.C. Aukerman*, 960 F.2d at 1032).  "[T]he underlying critical factors of

13 laches are presumed upon proof that the patentee delayed filing suit for more than six years after

14 actual or constructive knowledge of the defendant's alleged infringing activity."  *Id.* at 1349-50.

15 (quoting *A.C. Aukerman*, 960 F.2d at 1035-36).  The delay "is measured from the time [the

16 patentee] knew or reasonably should have known of [the] alleged infringing activities to the date

17 of suit."  *Id.* at 1349 (citing *A.C. Aukerman*, 960 F.2d at 1032).

18        While "laches bars relief on a patentee's claim only with respect to damages accrued prior

19 to suit," where the patentee "in addition to being guilty of laches has, by his conduct, estopped

20 himself from asserting his rights under the patent, all relief should be denied . . . ."  *A.C.*

21 *Aukerman*, 960 F.2d at 1041.  "As equitable defenses, laches and equitable estoppel are matters

22 committed to the sound discretion of the trial judge . . . ."  *Id.* at 1028.  "With its origins in

23 equity, a determination of laches is not made upon the application of 'mechanical rules.'"  *Id.* at

24 1032 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).  Because laches calls for

25 "flexibility in its application," courts "must look at all the particular facts and circumstances of

26 each case and weigh the equities of the parties."  *Id.* (citing *Bott v. Four Star Corp.*, 807 F.2d

27 1567, 1576 (Fed. Cir. 1986)).  "Like laches, equitable estoppel is not limited to a particular

28 factual situation nor subject to resolution by simple or hard and fast rules."  *Id.* at 1041.

1    Based on the evidence presented at trial, the Court holds that Plaintiffs' infringement

2    claim on the '556 patent is barred by the doctrines of laches and equitable estoppel.  This

3    holding is supported by the Court's finding that, on hearing the testimony of witnesses at trial,

4    Plaintiffs' witnesses were far less credible than Defendants' witnesses.  Before explaining the

5    bases for its findings, the Court first briefly discusses the relevant procedural history.

6

7    **2.1    Procedural History**

8

9    In 2004, the district court found the '556  patent unenforceable due to laches and granted

10   summary judgment for Defendants.  *Ultimax Cement Mfg. Corp v. CTS Cement Mfg. Corp.*,

11   2004 U.S. Dist. LEXIS 29580 (C.D. Cal. Dec. 6, 2004) (Stotler, J.), *rev'd*, 587 F.3d 1339 (Fed.

12   Cir. 2009).  The district court and Federal Circuit opinions provide a helpful framework for

13   reviewing laches.  The learned district judge previously presiding found that Defendants

14   established laches because Kunbargi's extensive personal and professional relationship with

15   Rice put him on "inquiry notice regarding defendants' accused cement from the date of the

16   issuance of the 556," and that "CTS's competition in the rapid hardening cement market should

17   have heightened Kunbargi's vigilance."  *Id.* at *48-49 (citing *Wanlass v. GE*, 148 F.3d 1334,

18   1340 (Fed. Cir. 1998) ("[The patent holder's] failure to investigate GE's products is especially

19   egregious in light of his past dealings with GE.")).  The court went on to say that

20   [t]he friendly notes written by Rice to Kunbargi, and Kunbargi's bare

21   assertions that Rice maintained that CTS was not using 'soluable

22   [sic] anhydrite' in Rapid Set, [were] insufficient to contradict the

23   other evidence that demonstrates that plaintiffs should have been on

24   inquiry notice from the date of the issuance of the 556 patent in

25   1990.

26   *Id.* at *49-50.

27   In reaching its decision, the court relied on Defendants' evidence establishing that

28   "Kunbargi expressed his intent to sue CTS as early as 1997, but was waiting for Rice to build up

21

1   the business." *Id.* at *50.  The court noted that Kunbargi once hired a private investigator to

2   look into CTS's activities, but found this minimal effort insufficient to satisfy his duty to inquire,

3   *see Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 998 F.2d 1157, 1162 (Fed. Cir.

4   1993), especially because "Plaintiffs provide[d] no evidence regarding the scope of the private

5   investigator's inquiry." *Id.* at *49.  The district court also acknowledged Plaintiffs' argument

6   that it would have been impossible to reverse engineer the cement.  But "[g]iven the twelve-year

7   delay between the issuance of the patent and the filing of the present suit, and the fact that

8   plaintiffs were on inquiry notice of potential infringement well before 1997 when plaintiffs

9   admit Kunbargi contemplated filing suit," the court ruled that laches barred Plaintiffs' suit

10  notwithstanding Plaintiffs' purported inability to reverse engineer Defendants' cement.  *Id.* at

11  *50.

12          In 2009, the Federal Circuit reversed the district court's ruling, holding that "genuine

13  issues of material fact precluded summary judgment that the '556 patent is unenforceable due to

14  laches . . . ."  *Ultimax*, 587 F.3d at 1349.  The Federal Circuit ruled that the district court's

15  finding of laches at the summary judgment stage was improper because "it [was] not clear that

16  Ultimax knew or should have known of CTS's alleged infringement before it conducted

17  discovery on the '684 patent in 2002."  *Id.*  The Federal Circuit also stated that "there is a

18  genuine issue of material as to whether Kunbargi fulfilled his duty to investigate by hiring a

19  private investigator, especially given Kunbargi's allegation that Rice assured him that CTS was

20  not infringing because it did not use soluble anhydrite."  *Id.* at 1350.  Thus, the issue of laches is

21  framed.

22

23          **2.2    Plaintiffs Delayed Unreasonably in Filing Suit**

24

25          To establish laches, Defendants must first show that Plaintiffs delayed filing suit for an

26  unreasonable and inexcusable length of time after they discovered or *reasonably should have*

27  *discovered* that Defendants were allegedly infringing the '556 patent.  *See Ultimax*, 587 F.3d at

28  1349 (citing *A.C. Aukerman*, 960 F.2d at 1032).  In determining the date of constructive

1  knowledge, a patentee is charged "with such knowledge as might have obtained upon inquiry,

2  provided the facts already known by him were such as to put upon a man of ordinary intelligence

3  the duty of inquiry." *Advanced Cardiovascular*, 988 F.2d at 1162.

4  While genuine issues of material fact precluded a finding *at the summary judgment stage*

5  that Plaintiffs should have known about Defendants' alleged infringement when the patent was

6  issued in 1990, the same rigorous evidentiary standards do not bar such a finding now.  The

7  evidence presented during the course of this four-week trial convincingly establishes that

8  Kunbargi and his fellow Plaintiffs reasonably should have known of their claims against

9  Defendants well before they filed suit.  Kunbargi's extensive employment history with Rice and

10 Rice's entities, his participation in Burn One, and his acknowledgment that "the cement of the

11 future" produced at Burn One was "patentable" and commercially viable, put Kunbargi on

12 inquiry notice of his claims against Defendants from the date the '556 patent was issued in 1990.

13 The fact that Plaintiffs considered CTS to be their main competitor further sets in concrete that

14 Plaintiffs had constructive notice of their claims before filing suit.  (Ex. 4406.)

15 Plaintiffs argue that they had no reason to suspect that Defendants' cement infringed

16 anytime before 2002 because Rice assured Kunbargi otherwise.  The Court finds Kunbargi's

17 scant testimony regarding Rice's assurances not credible.  But even if Rice did make such

18 statements, they would not have been sufficient to overcome the substantial evidence

19 establishing Plaintiffs' constructive knowledge of the alleged infringement.

20 Plaintiffs also argue that Kunbargi's hiring of a private investigator in 1997 precludes a

21 finding of laches because it establishes that Kunbargi made reasonable attempts to discover

22 Defendants' alleged infringement.  As an initial matter, the Court notes that Kunbargi's decision

23 to hire this investigator in the first place undermines his testimony that he was entirely blind to

24 any potential infringement before 1997.  Indeed, Kunbargi admits that he hired a private

25 investigator after receiving information that Rice was infringing the '556 patent.  But Plaintiffs

26 do not come close to showing that Kunbargi's decision to hire this investigator, even if true,

27 satisfied his "duty to inquire," *see Advanced Cardiovascular*, 998 F.2d at 1162, especially given

28 the credibility issues surrounding Kunbargi's testimony related to Rice's purported assurances.

*See also Ultimax*, 587 F.3d at 1350 (reversing summary judgment because "[t]here is a genuine issue as to whether Kunbargi fulfilled his duty to investigate by hiring a private investator, especially given Kunbargi's *allegation* that Rice assured him that CTS was not infringing because it did not use soluble anhydrite." (emphasis added)).  Plaintiffs do not identify the investigator, much less describe his qualifications.  Nor do Plaintiffs explain what the investigator actually did, or provide any documentary evidence of his conclusions.

Plaintiffs' legal arguments opposing Defendants' Laches and Estoppel Motion are unsupported and unsound.  Plaintiffs argue, for example, that Kunbargi could not have been on notice of Defendants' infringement because he stopped working for Rice and CTS after Burn One in 1988 and before the '556 patent was issued.  This argument fails because it conflates the concepts of actual and constructive notice.  Kunbargi may not have *actually* known that the accused cement infringed the '556 patent, but his participation in Burn One put him on constructive notice of Defendants' purported infringement.  Indeed, as noted in Section 1, Kunbargi admitted that all elements of claim 9 were present at Burn One.  (Tr. Sept. 16, 2011, Dkt. No. 1584, Part 4, at 48:1-3 ("Q: [Defense Counsel] All the elements in Claim 9 were at hand at Burn 1, weren't they? A: [Kunbargi] Yes.").)

Kunbargi also saw the commercial viability of the cement produced at Burn One and sought greater compensation for his participation in its creation.  Kunbargi stated that "the new Rapid Set cement [created at Burn One] is going to be the cement of the future," (Ex. 558), and argued that his "contributions to the new technology of producing the new Rapid Set" entitled him to a stake in this "patentable" cement.  (Ex. 558.)

The evidence at trial persuades the Court that Plaintiffs should have known of their claim against CTS when the '556 patent was issued – 12 years before they filed suit.  While laches may be "presumed upon proof that the patentee delayed filling suit for more than six years after actual or constructive knowledge of the defendant's alleged infringing activity," *A.C. Aukerman*, 960 F.2d at 1035-36, the Court need not apply that presumption because the evidence establishes that Plaintiffs' delay was not reasonable or excusable.

### 2.3    Plaintiffs' Unreasonable Delay Caused Defendants Evidentiary and Economic Prejudice

Proving unreasonable delay is not sufficient to establish the defense of laches. Defendants must also show that Plaintiffs' unreasonable delay caused it prejudice.   *See Ultimax*, 587 F.3d at 1349 (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc)).  "Such prejudice may be economic or evidentiary."  *A.C. Aukerman*, 960 F.2d at 1033 (citing *Cornetta v. United States*, 851 F.2d at 1372, 1378 (Fed. Cir. 1988)).  As the Federal Circuit explained in *A.C. Aukerman*,

> Evidentiary, or "defense" prejudice, may arise by reason of a
> defendant's inability to present a full and fair defense on the merits
> due to the loss of records, the death of a witness, or the unreliability
> of memories of long past events, thereby undermining the court's
> ability to judge the facts.

*Id.*  Economic prejudice, on the other hand, "may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.*

The evidence submitted at trial convincingly establishes that Plaintiffs' unreasonable delay caused Defendants both types of prejudice.  Plaintiffs unreasonable delay resulted in substantial evidentiary prejudice because many of those involved in Burn One – namely Dick Pegram, Larry Roach, and John Bush – are now dead.  (Tr. Oct. 5, 2011, Dkt. No. 1571, at 156:7-20, 158:4-159:13.)  Indeed, Kunbargi acknowledged that the cement produced at Burn One was "designed" by Pegram and the burn temperature used in the kiln was "reached as a result of a consensus between Mr. Rice, Mr. Pegram, Mr. Keller, and [Mr. Kunbargi]." (Tr., Sept. 16, 2011, Dkt. No. 1584, Part 3, at 28:18-29:1.)

Besides the unavailability of key witnesses, Plaintiffs' delay also resulted in the loss of records.  Additionally, memories have faded since Burn One occurred in 1988.  Indeed, Rice was 62 years old when he organized Burn One and is 86 years old now.  The evidence also

1    establishes that Defendants suffered economic prejudice through expenditures that would not

2    have occurred if Plaintiffs had filed their lawsuit sooner.  *See, e.g., ABB Robotics v. GMFanuc*

3    *Robotics Corp.*, 52 F.3d 1062, 1062-64 (Fed. Cir. 1995).

4

5        **2.4     Equitable Estoppel Bars Post-Suit Recovery**

6

7        As noted, laches bars relief on a patentee's claim for damages that accrued before the

8    patentee files suit.  The defense of equitable estoppel, by contrast, bars all relief in an

9    infringement action – both before and after the lawsuit is filed.  *See A.C. Aukerman*, 960 F.2d at

10   1041 (holding that where the patentee "in addition to being guilty of laches has, by his conduct,

11   estopped himself from asserting his rights under the patent, all relief should be denied"); *see also*

12   *ABB Robotics v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995) ("Estoppel is an

13   equitable defense to a charge of patent infringement and, if proven, may entirely bar an

14   infringement suit.")**.**

15       Defendants argue that Plaintiffs should be equitably estopped from obtaining any relief,

16   and the Court agrees.  Plaintiffs do not sufficiently address this argument in any their seven post-

17   trial fillings.  (*See* Dkt. Nos. 1552, 1553, 1555, 1556, 1567, 1613, 1615.)  Instead, Plaintiffs

18   conflate the concepts of laches and estoppel, relying exclusively on the argument that Plaintiffs

19   had no reason to know of Defendants' infringement before 2002 to defeat both.

20       "Three elements are required to prove estoppel."  *ABB Robotics*, 52 F.3d at 1063.  "The

21   first is that the patentee, through misleading conduct, leads the alleged infringer to reasonably

22   infer that he does not intend to enforce the patent against the alleged infringer.  The conduct may

23   include specific statements, action, inaction, or silence where there was an obligation to speak."

24   *Id.*

25       As noted, the evidence shows that Plaintiffs were on inquiry notice of the accused product

26   years before filing suit.  Plaintiffs' inaction over a 12-year period coupled with numerous other

27   factors led Defendants to reasonably conclude that Plaintiffs were not going to assert

28   infringement claims on the '556 patent.  These factors include the close personal and

1   professional relationship between Rice and Kunbargi, Kunbargi's detailed knowledge of the

2   cement first produced at Heartland and described in the '556 patent, Kunbargi's request for a

3   financial stake in the new cement, and his suggestion that Rice obtain a patent or trademark on

4   the cement.  Indeed, in his December 1988 letter to Rice, Kunbargi described the new rapid

5   hardening cement as "the cement of the future," told Rice that the new cement was "patentable,"

6   and requested compensation for his "contributions to the new technology."  (Exs. 558, 565.)

7   These factors, combined with the 12-year delay in filing suit after receiving inquiry notice of the

8   infringing product, led Defendants to reasonably believe that Plaintiffs had abandoned any

9   infringement claim.  *See A.C. Aukerman*, 960 F.2d 1042 ("[P]laintiff's inaction must be

10  combined with other facts respecting the relationship or contacts between the parties to give rise

11  to the necessary inference that the claim against the defendant is abandoned.").  Defendants'

12  reliance is made all the more reasonable by the believable testimony that they assumed they had

13  a shop right to use the allegedly infringing cement.  Again, testimony from Plaintiffs' witnesses

14  that Rice assured Plaintiffs that CTS's cement did not infringe the '556 patent lacked credibility.

15          The second element of an equitable estoppel defense is reliance.  In other words, "[t]he

16  accused infringer must show that . . . it substantially relied on the misleading conduct of the

17  patentee in connection with taking some action."  *A.C. Aukerman*, 960 F.3d. at 1042-43.  The

18  credible evidence establishes that Defendants spent more than a decade developing, marketing,

19  and selling the rapid-hardening cement while justifiably relying on Plaintiffs' apparent decision

20  not to assert an infringement claim.  Evidence of Defendants' substantial investments in

21  producing and commercializing the allegedly infringing cement further establishes that they

22  relied on Plaintiffs' lengthy inaction.

23          The final element of the equitable estoppel defense is prejudice.  The "accused infringer

24  must establish that it would be materially prejudiced if the patentee is now permitted to proceed.

25  As with laches, the prejudice may be a change of economic position or loss of evidence."  *A.C.*

26  *Aukerman*, 960 F.2d at 1043 (citing *Advanced Hydraulics*, 525 F.2d at 481-82).  As explained

27  more fully in the preceding section, the evidence establishes that Plaintiffs' unreasonable delay

28  in filing suit caused Defendants substantial evidentiary and economic prejudice.

The Court finds that Plaintiffs are equitably estopped from asserting their infringement claims against Defendants.

### 2.5     Conclusion

The doctrines of laches and equitable estoppel bar Plaintiffs from asserting any claims for infringement of the '556 patent against Defendants.  Accordingly, the Court GRANTS Defendants' Laches and Estoppel Motion.

## DISPOSITION

The Court GRANTS Defendants' Rule 50 Motion as to shop right.  The Court also GRANTS Defendants' Laches and Equitable Estoppel Motion.  Judgment for Defendants as a matter of law is appropriate on each of these Motions standing alone.  The parties' remaining Motions are DENIED as moot.

IT IS SO ORDERED.

DATED: April 20, 2012

_____
Andrew J. Guilford
United States District Judge